# Illinois Official Reports

## Appellate Court

---

*People ex rel. Raoul v. Illinois Commerce Comm'n*, 2021 IL App (1st) 200366

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION; COMMONWEALTH EDISON COMPANY; CITIZENS UTILITY BOARD; ILLINOIS INDUSTRIAL ENERGY CONSUMERS; UNIVERSITY OF ILLINOIS; STERLING STEEL COMPANY; MERCHANDISE MART; GENERAL IRON COMPANY; EXXONMOBIL POWER & GAS SERVICES, INC.; ENBRIDGE ENERGY, LTD. PARTNERSHIP; and CATERPILLAR, INC., Respondents. |
| District & No. | First District, Sixth Division<br>No. 1-20-0366 |
| Filed | June 25, 2021 |
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, No. 19-0387. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Frank H. Bieszczat, Assistant Attorney General, of counsel), for petitioner. |

Robert W. Funk, Rebecca L. Segal, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission.

E. Glenn Rippie and Hanna M. Conger, of Jenner & Block LLP, of Chicago, and Matthew E. Price, of Jenner & Block LLP, of Washington, D.C., for appellee Commonwealth Edison Company.

Panel        PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Harris and Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1        Following an annual rate update proceeding pursuant to the Public Utilities Act (Utilities Act or Act) (220 ILCS 5/1-101 *et seq.* (West 2018)), the Illinois Commerce Commission (Commission) issued a final order in which it made several decisions affecting the delivery service charges that electric utility Commonwealth Edison Company (ComEd) was permitted to collect from its customers in 2020. On direct appeal to this court, the Attorney General, on behalf of the people of the State of Illinois, challenges two aspects of the Commission's order.

¶ 2        The Attorney General's first challenge pertains to the fact that ComEd, like other utilities, uses the rates it charges to fund deferred income taxes that it will be required to pay in the future. A portion of the amount the utility had already designated for this purpose was rendered excess in 2018, however, when the federal corporate income tax rate was significantly reduced. The parties agree that the excess funds must be amortized over a period of time as reductions to ComEd's costs, which will result in lower rates to consumers. The Commission considered but rejected the Attorney General's suggestion that this should occur over a period of five years, agreeing instead with ComEd that a 39.47-year period would be more appropriate.

¶ 3        In his second challenge to the Commission's order, the Attorney General argues that the Commission improperly allowed certain plant additions to be included as cost inputs for purposes of calculating ComEd's 2020 rates. Through the rates it charges, ComEd may recover its reasonable costs for delivering electricity to its customers, plus a rate of return on its invested capital. Rates are set prospectively based on projected costs and later reconciled to reflect actual costs. To facilitate this process, each year the utility must file with the Commission both its actual costs for the preceding year and its projected costs for the current year. The Attorney General argues that plant additions initially projected to go into effect in 2019, but which it became clear during the ratemaking proceeding would not go into effect until 2020, should not have been included in these calculations.

¶ 4        As explained in more detail below, our review of the record in this case, the Commission's detailed order and the parties' well-articulated arguments on appeal reveal no basis on which our deference to the Commission's broad expertise in the area of ratemaking should be

questioned in this instance. We affirm the Commission's order.

## I. BACKGROUND
### A. An Overview of Ratemaking Under the Utilities Act

The Commission is the administrative agency created by the Utilities Act and charged with approving the rates that public utilities may charge their customers. See *id.* §§ 2-101, 4-101, 9-102. The Act provides that all rates and charges by public utilities must be "just and reasonable." *Id.* § 9-101. In 2011, the Utilities Act was amended by Public Act 97-616 (Pub. Act 97-616, § 10 (eff. Oct. 26, 2011) (adding 220 ILCS 5/16-108.5)), known as the Energy Infrastructure Modernization Act (EIMA). Under EIMA, utilities serving more than one million customers in Illinois may elect to participate in an infrastructure development program designed to create jobs in the state. 220 ILCS 5/16-108.5(b) (West 2018). Through a performance-based ratemaking formula, participating utilities are guaranteed a rate that allows them to recover their expenditures associated with this program plus a rate of return on their invested capital. *Id.* The total amount a utility may charge its customers—its "revenue requirement"—is calculated using the following basic formula: "R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital)." (Internal quotation marks omitted.) *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 195 (1991).

Once the Commission has approved a participating utility's formula rate structure and initial rates, EIMA requires it to evaluate the utility's revenue requirement annually. 220 ILCS 5/16-108.5(c) (West 2018). On or before May 1 of each year, the utility must submit updated cost inputs for this purpose. *Id.* § 16-108.5(d). Because actual costs will not yet be known when rates are established for the year following the update (referred to as the "rate year"), projected costs for the current year are used. *Id.* § 16-108.5(d)(1). These are based on the utility's most recent Federal Energy Regulatory Commission (FERC) Form 1, "plus projected plant additions and correspondingly updated depreciation reserve and expense for the calendar year in which the inputs are filed." *Id.* The new rates are effective from January to December of the rate year. *Id.* § 16-108.5(d)(2). At the same time, the utility submits its actual, known costs for the year preceding the update (two years prior to the rate year), and the difference between the actual and projected costs for that year are reconciled, with the balance collected or refunded, with interest, during the rate year. *Id.* § 16-108.5(d)(1). As a result, the accuracy of the cost projections a utility submits with its annual rate update does not affect the total costs it ultimately recovers, only *when* it recovers those costs.

### B. ComEd's 2020 Formula Rate Update

ComEd became a participating utility under EIMA in 2012, agreeing to invest approximately $2.6 billion in additional infrastructure over a 10-year period. As it had in the intervening years, in April 2019, ComEd submitted to the Commission its updated cost inputs for the calculation of its performance-based rates for January to December of the following year. In calculating its projected revenue requirement for 2020, ComEd included historical costs and rate base data from its most recent FERC Form 1, its projected plant additions for 2019, and updated depreciation and expense corresponding to those expected additions. ComEd then calculated its reconciliation adjustment for 2018 and applied this to its projected revenue requirement for 2020. The updated delivery charges ultimately approved by the

Commission for January to December of 2020 were designed to allow ComEd to recover this amount.

¶ 11 The Commission opened a docketed proceeding to investigate the reasonableness of ComEd's updated cost inputs and revenue requirement calculations. Commission staff participated as a party to that proceeding. The Attorney General, representing the people of Illinois, also participated on behalf of ratepayers and was joined by intervenors, Illinois Industrial Energy Consumers and Citizens Utility Board (IIEC/CUB). During that proceeding, the Attorney General objected to ComEd's 2020 revenue requirement calculations on two grounds, arguing that (1) amortization of a certain category of excess deferred income taxes should be over a five-year period, rather than the 39.47-year period proposed by ComEd, and (2) certain plant additions initially projected to go into service in 2019 should be excluded from the calculations because during the rate update proceeding it became clear they would not go live until 2020.

¶ 12 ### C. Evidence and Arguments Considered by the Commission

¶ 13 The administrative law judge (ALJ) assigned to this matter heard live testimony from a ComEd representative in August 2019 and received written testimony from that witness and over a dozen additional witnesses, including a number of experts. What follows is a brief overview of the evidence before the Commission.

¶ 14 ### 1. Amortization of Unprotected Property-Related EDIT

¶ 15 On the amortization issue, the Attorney General submitted the written testimony of Michael Brosch, a consultant in the field of public utility regulation. Mr. Brosch explained that accumulated deferred income taxes (ADIT) are funds a utility collects from its customers for the payment of income taxes in advance of those taxes becoming due. A large portion of a utility's ADIT balance arises when it is permitted to claim accelerated depreciation of an asset for federal tax purposes but not for state regulatory financial reporting. The utility holds on to the money to pay the higher federal taxes that will become due when the accelerated depreciation period ends. Accumulated deferred income taxes become *excess* deferred income taxes (EDIT) when it becomes clear that they will never become due. This happened on December 31, 2017, when the Tax Cuts and Jobs Act of 2017 (TCJA) reduced the federal business income tax rate from 35% to 21%. See Pub. L. 115-97, 131 Stat. 2054 (2018). Taxes that, according to Mr. Brosch, ComEd had already collected from its customers at the 35% rate would instead ultimately be paid to the federal government at the new 21% rate. This created an EDIT balance of approximately $1.5 million that ComEd needed to return to its customers in the form of credits to its operating costs.

¶ 16 Mr. Brosch explained that this EDIT balance was comprised of four different categories of EDIT—(1) code-protected, (2) unprotected property-related, (3) unprotected non-property-related, and (4) net operating loss deferred tax asset. The first and largest category, code-protected EDIT, represents roughly 70% of the EDIT balance at issue here. Federal law requires that the amortization period for this category of EDIT be calculated using the average rate assumption method (ARAM), an approach based on the projected useful life of the asset that initially gave rise to the deferred taxes at issue. Mr. Brosch agreed with ComEd that the 39.47-year amortization period generated using ARAM was appropriate both for this first category and for the fourth category of EDIT, net operating loss deferred tax asset EDIT. He

further agreed with ComEd's proposal, in the absence of a requirement that ARAM be utilized, of a five-year amortization period for the third category—unprotected non-property-related EDIT.

¶ 17 The only category of EDIT for which the parties' disagreed on an appropriate amortization period, then, was the second (and second largest) category—unprotected property-related EDIT. As with unprotected non-property-related EDIT, use of ARAM was not required. And as with that category, Mr. Brosch was of the opinion that a five-year amortization period was most appropriate because it would return the EDIT to ComEd's customers faster, making it "more likely that the same ratepayers who previously paid the excessive deferred taxes [would] benefit." This was, Mr. Brosch represented, consistent with the repayment periods adopted by several other states and would also serve to offset the higher revenue requirements associated with the early years of an asset's operating life.

¶ 18 Consistent with this testimony, the Attorney General argued that the Commission should revisit its decision, made during the previous year's formula rate update, to allow ComEd to amortize unprotected property-related EDIT over 39.47 years. That decision, the Attorney General maintained, was based on two erroneous conclusions: (1) that EDIT was not ratepayer-funded and (2) that the amortization period should be tied to the life of the asset that originally gave rise to the deferred taxes, where EDIT funds are by nature "excess" and no longer connected to the taxes that will be paid on the asset. The Commission had considered and rejected these same arguments in ComEd's 2018 formula rate update proceeding, where the Attorney General had urged the Commission to adopt either a 5- or a 10-year amortization period. *In re Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 18-0808, at 57, 61 (Order-Final Dec. 4, 2018).

¶ 19 IIEC/CUB filed a brief joining in the Attorney General's argument on this point. Although acknowledging both that the conversation around EDIT was an "exceptionally complex" one and that the Commission had discretion, for unprotected property-related EDIT, to set whatever amortization period it concluded was just and reasonable, IIEC/CUB argued that the Commission should reject the determination it had made the year prior and adopt the Attorney General's "more appropriate" time period.

¶ 20 In both oral and written testimony, ComEd's Director of Rates and Revenue Policy, Chad Newhouse, challenged the accuracy of the facts underlying Mr. Brosch's conclusions, accusing him of conflating the concepts of depreciation and return on investment. Mr. Newhouse explained that each time ComEd records a deferred tax expense, it also records a corresponding credit to current taxes in the same amount, which has the effect of completely offsetting the ADIT. According to Mr. Newhouse, the customer impact of deferred taxes occurs "as the book to tax timing difference reverses in the *future*" (emphasis in original), and deferred taxes are thus passed through to customers only when they become due. Based on this testimony, ComEd argued that its current customers had not "funded" the utility's ADIT balance and that there was thus "no justification to view the EDIT as a pending 'refund' that should be made as quickly as possible." ComEd maintained that deferred taxes were more akin to an interest-free government loan. In Mr. Newhouse's view, the most equitable way to distribute the savings when it became clear that deferred taxes would never become due was not to "provide[ ] an immediate payment of disproportionate benefits to current customers" that would "unfairly penalize[ ] future customers who will continue to fund long-lived utility assets over their remaining useful lives," but to spread the savings over the life of the asset originally associated

with the deferred taxes. The Attorney General's proposal was arbitrary, he believed, because it made more sense to amortize all property-related EDIT, whether protected or unprotected, over the same 39.47-year period. Mr. Newhouse also maintained that the examples raised by Mr. Brosch of other states adopting shorter amortization periods were the result of settlements or stipulations and had no real bearing on the Commission's discretion to choose a suitable rate based on the evidence before it.

¶ 21    The Commission's staff presented the testimony of its own witness on this issue, Dianna Trost, a certified public accountant in its Financial Analysis Division. Ms. Trost agreed with Mr. Newhouse that the Commission should reaffirm its decision to adopt ComEd's longer amortization period. In Ms. Trost's opinion, the Commission's previous decision was sound, there had been no changes in material facts or governing law, and it would be a waste of resources to continue to re-visit the issue year after year. Ms. Trost agreed with Mr. Newhouse that adopting the Attorney General's arbitrary five-year amortization period would create "intergenerational inequity," by giving all of the benefit of the EDIT balance to ratepayers in the early years of the property's life and denying any share of it to ratepayers in later years, who would still be paying for the cost of the underlying asset. Ms. Trost further opined that a longer amortization rate would preserve an EDIT balance that could be used to offset the impact of future tax increases or spikes in delivery service rates.

¶ 22    The staff's recommendations in this matter aligned with Ms. Trost's testimony. Although the staff agreed with ComEd that EDIT "is somewhat analogous to a forgiven loan," later in the proceedings they stated that they "[did] not take issue with the position that ratepayers funded the EDIT [balance]." The staff ultimately supported ComEd's proposal for a 39.47-year amortization period for unprotected property-related EDIT, not based on the source of those funds, but rather because (1) it was consistent with the decision the Commission had made on that issue the prior year, (2) ComEd's proposal would ensure that amortization aligned with the life of the asset that gave rise to the deferred taxes, and (3) a longer amortization period would permit the tax savings resulting from the TCJA's tax reductions to offset future tax increases.

¶ 23                2. Projected Plant Additions Associated With the Microgrid Project

¶ 24    Another issue raised by the Attorney General was the inclusion of three challenged plant additions that would not go live by the end of 2019. ComEd presented the testimony of two of its executives: (1) Nichole Owens, ComEd's Vice President of Customer Channels, who spoke about the utility's business planning and project management process, and (2) Michael Moy, ComEd's Director of Asset Performance, who testified concerning the utility's projected cost inputs for rate-setting proceedings. Mr. Moy discussed the types of assets typically included in ComEd's rate base and the utility's practices for identifying, prioritizing, and implementing plant additions. Ms. Owens and Mr. Moy together gave a detailed account of ComEd's 2019 projected plant additions. According to these witnesses—and the Attorney General does not dispute this—when ComEd forecast these additions, it reasonably expected them to be used in the delivery of electric services to customers by December 31, 2019.

¶ 25    The Attorney General initially objected to the inclusion of five plant additions but ComEd agreed to exclude two of those from its rate calculations, on the basis that one should not have been categorized as a plant addition and the other should not have been forecasted to go live in 2019. The Attorney General stood by its request that three other plant additions, all

associated with the Bronzeville Microgrid Demonstration Pilot Project (Microgrid Project), should also be excluded. ComEd objected to this request, however, because as even the Attorney General agreed, the utility's forecast that those projects would go live in 2019 was accurate when it was made.

¶ 26　In support of its request that these three additional plant additions be excluded, the Attorney General presented the testimony of Mary Selvaggio, a consulting expert with extensive accounting experience. Ms. Selvaggio acknowledged that any overstatement of costs in ComEd's annual projections resulting from the inclusion of plant additions projected for 2019 would be remedied during the next year's reconciliation process. She nevertheless believed that ComEd should have updated its projections mid-proceeding, as new information became available. Otherwise, she opined, "the resulting revenue requirement based on that rate base would be overstated and more inaccurate than it need[ed] to be."

¶ 27　Based on this testimony—and on the language of section 16-108.5(c) of the Utilities Act, which provides that a utility shall annually file, together with its actual costs for the previous year, "projected plant additions and correspondingly updated depreciation reserve and expense *for the calendar year in which the tariff and data are filed*" (emphasis added) (220 ILCS 5/16-108.5(c) (West 2018))—the Attorney General argued that it was improper for the Commission to include the disputed plant additions in the calculation of ComEd's 2020 rates.

¶ 28　ComEd rebutted this testimony with that of Susan Tracy, manager of its Revenue Policy Group. Ms. Tracy explained that a forecast is, by definition, an estimate that is subject to change. In her view, new information received over the course of a filing year generally does not warrant retroactive revision of a forecast. She criticized Ms. Selvaggio's assertion that a more accurate forecast would be achieved simply by removing the three delayed plant additions that the Attorney General had chosen to focus on, pointing out that, in any given year, some projected projects might not go live until the following year, but others might go live early, during the preceding year. ComEd's position was that the Utility Act's statutory reconciliation process—and not a requirement that utilities constantly update their projections during lengthy ratemaking proceedings—was the appropriate method for resolving such uncertainties.

¶ 29　The Commission's staff agreed with ComEd both that the challenged plant additions should remain in the formula rate calculation and that the statutory reconciliation process was the appropriate method for addressing uncertainty in forecasts.

¶ 30　Following this evidence, the parties submitted their position statements and proposed conclusions. On October 23, 2019, the ALJ issued a proposed order ruling in ComEd's favor on these two disputed issues. The Attorney General filed exceptions to the proposed order reiterating its positions, and these were responded to by both ComEd and the Commission's staff. The Attorney General's request for oral argument was granted, and the parties argued their positions before the full Commission on November 25, 2019.

¶ 31　　　　　　　　　　　D. The Commission's Final Order

¶ 32　The Commission issued a 54-page final order, plus attachments, in this matter on December 4, 2019. The Commission adopted ComEd's proposal of a 39.47-year amortization for unprotected property-related EDIT, finding it was just and reasonable for the utility to use ARAM to align the amortization of this category of EDIT with the remaining useful life of the underlying assets relating to those taxes. The Commission noted that it had thoroughly

considered the Attorney General's position and Mr. Brosch's opinions during ComEd's 2018 formula rate update proceeding and that no change in the applicable facts or law suggested that a different result should be reached this year.

¶ 33 The Commission also found it was reasonable to include as cost inputs for ComEd's 2020 rates the three challenged plant additions associated with the Microgrid Project that ComEd originally projected would be placed into service in 2019 but that were later deferred until 2020. The Commission concluded that the Utilities Act does not require utilities to update their forecasts during a formula rate update proceeding, that doing so would unnecessarily complicate such proceedings, and that the statutory cost reconciliation process was intended to and did adequately address the issue.

¶ 34 The Commission denied the Attorney General's application for a rehearing, and the Attorney General then filed a notice of appeal with the Commission and a petition for review with this court.

## II. JURISDICTION

¶ 35

¶ 36 The Commission entered its final order in this matter on December 4, 2019, and denied the Attorney General's application for a rehearing on January 21, 2020. The Attorney General timely petitioned this court for review of the Commission's order on February 24, 2020. Section 10-201 of the Utilities Act provides that a final order of the Commission may be appealed directly to the appellate court for a district in which the subject matter of the hearing is situated "for the purpose of having the reasonableness or lawfulness of the *** order or decision inquired into and determined." *Id.* § 10-201(a). We thus have special statutory jurisdiction over this appeal pursuant to that section, and in accordance with Illinois Supreme Court Rule 335 (eff. July 1, 2017) and section 3-113 of the Code of Civil Procedure (735 ILCS 5/3-113 (West 2018)), governing the direct review of administrative orders by the appellate court.

## III. ANALYSIS

¶ 37

¶ 38 The Attorney General urges us to reverse the Commission's December 4, 2019, final order in this matter, arguing the Commission erred by (1) approving ComEd's proposal to amortize unprotected property-related EDIT over 39.47 years, rather than the 5-year period proposed by the Attorney General, and (2) failing to require ComEd to update its projected plant additions for 2019 during the formula rate update process, rather than allowing it to do so in the following year's actual-cost reconciliation.

### A. ComEd's Mootness Arguments

¶ 39

¶ 40 We first consider ComEd's argument that this appeal should be dismissed as moot. "Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions." *Goral v. Dart*, 2020 IL 125085, ¶ 76. "An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006).

¶ 41    ComEd argues that the Attorney General's appeal is moot because the 2020 rates established by the Commission in the challenged order were superseded by new rates approved for 2021. Because it "is no longer charging its customers the rates established by the Order on review," ComEd insists that it is "not possible for this Court to grant effectual relief to the [Attorney General]." In support of this position, ComEd relies on our supreme court's decision in *Independent Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90 (1987). As the court explained in that case, utility companies are required by the Act to charge *only* the approved rates that have been deemed just and reasonable and are on file with the Commission. *Id.* at 97. Absent a stay or suspension of a rate order, the approved rates are the ones that will apply during the pendency of an appeal, and a Commission-approved rate is by definition not excessive. *Id.* The court's determination in *Independent Voters* that certain expenses and deductions allowed in the Commission's rate order were improper thus only invalidated those portions of the rate order "from the time [the] court entered its judgment" until "the new rates took effect" in January of the following year. *Id.* at 102-03. ComEd's argument here is that, because the Attorney General did not seek to stay the effect of the Commission's December 4, 2019, order and because new rates took effect in January 2021, a finding in favor of the Attorney General on either of the issues raised in this appeal can result in no refund to ratepayers of any portion of the rates ComEd charged during 2020.

¶ 42    The Attorney General does not dispute this. He maintains, however, that this appeal is not moot, either because we may still grant effectual relief or because the issues raised are reviewable under an established exception to the mootness doctrine. We agree.

¶ 43    As to the first issue—the amortization period approved by the Commission for unprotected property-related EDIT—the Attorney General correctly points out that this decision affected not just the rates set for 2020 but will continue to affect rates set over the duration of the amortization period. Effectual relief may still be granted because a reversal of that decision would affect rates going forward.

¶ 44    This is not true for the second issue—the Attorney General's challenge to the inclusion of certain plant additions as projected costs for the establishment of ComEd's 2020 rates. On that issue, however, the Attorney General argues that the public interest exception to the mootness doctrine applies. A court may review an otherwise moot issue under that exception when "(1) the question presented is of a public nature; (2) an authoritative resolution of the question is desirable for the purpose of guiding public officers; and (3) the question is likely to recur." *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 9. Although the exception is a narrow one and "requires a clear showing of each of its criteria" (*Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 13), we are persuaded that it applies here.

¶ 45    First, the Commission decided a question of a public nature when it concluded that utilities are not obligated to update their forecasted plant additions during annual formula rate proceedings but may instead rely on the statutory reconciliation process to address new information arising during those proceedings regarding the accuracy of their filed projections. This was a decision that affected the electricity rates for millions of ComEd customers across northern Illinois. And although it directly affected only the rates ComEd charged those customers in 2020, the approach taken by the Commission could affect other formula rate update decisions in the future. In other words, it is not an issue that "uniquely applies only to a specific group of regulated entities for a specific project." *Id.* ¶ 14.

¶ 46 An authoritative resolution of the question also seems desirable. When considering this second criterion, our supreme court has emphasized "the importance of examining the state of the law as it relates to the moot question" and has generally declined to apply the exception in the absence of conflicting precedents. *In re Shelby R.*, 2013 IL 114994, ¶ 19. It has noted, however, that "the absence of [such] a conflict does not necessarily bar *** review," and "even issues of first impression may be appropriate for review under this exception." *Id.* ¶¶ 20-21 (collecting cases). Just as in *Shelby R.*, where our supreme court determined that "[p]roviding a definitive decision as to the statutory limits of a judge's sentencing authority for underage drinking, a common occurrence, [would] provide guidance not only to juvenile court judges and prosecutors, but also defense attorneys" (*id.* ¶ 22), here a definitive decision regarding the proper way to resolve discrepancies in projections that are revealed during formula rate update proceedings will provide guidance to the Commission, its ALJs and staff, consumer advocates, and the utilities appearing before the Commission.

¶ 47 Finally, we agree with the Attorney General that the issue is likely to recur. The Commission's position, as stated in its final order, that "[a] forecast, by its very nature, involves uncertainty," and that the statutory reconciliation process is "a balanced means of addressing any differences between forecasted and actual costs," confirms that the Commission's determination was not based on the unique facts of this case and could very well find application in future proceedings before the Commission. *Cf. Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 91 Ill. App. 3d 96, 98 (1980) (declining to invoke the exception where the court's rulings "would be evidentiary in nature" and "unique to the instant case").

¶ 48 We find additional support for our conclusion that the issues raised in this appeal are not moot in the fact that the Commission, which no doubt best understands the impact that its policies and ratemaking decisions will have on future proceedings, has not joined in ComEd's mootness argument.

¶ 49                                          B. Standard of Review

¶ 50 We next address the parties' disagreement concerning the appropriate standard of review on appeal. The level of deference given to an administrative agency's decision typically depends on the nature of the issue resolved by the agency. Questions of law are reviewed *de novo. Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 243 (2009). An agency's findings of fact, however, are generally reversed only if they are against the manifest weight of the evidence. *Id.* And between these two standards lies the "clearly erroneous" standard applicable to mixed question of fact and law—where the agency has applied an undisputed rule of law to established facts. *Id.* at 243-44. A decision is clearly erroneous where, having considered the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97-98 (2007).

¶ 51 The Attorney General argues that our review of the Commission's order in this case should be for clear error, on the basis that the historical facts are generally undisputed and it is only the application of the law to those facts that we must consider. The parties agree, for example, that EDIT has accrued and must be amortized to ComEd's ratepayers and that, during its 2019 formula rate update proceeding, it was made apparent that certain plant additions originally

forecasted for 2019 would not go into service until 2020. They disagree, however, on the conclusions that should have been drawn from those facts during the ratemaking process.

¶ 52    The standards articulated above, however, establish a framework best suited for the review of agency decisions that are judicial in nature—situations where the agency, like a court, has been called on to articulate the law, establish the facts, and apply the law to the facts. But our supreme court has made clear that "the matter of rate regulation is essentially one of *legislative* control" and is "not a judicial function." (Emphasis added and internal quotation marks omitted.) *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 59 (2004); see also *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 472 (1994) ("the determination of what utility rates should be is not a judicial function; the nature of judicial power is to pass on questions of law already in existence; the power to determine what the law should be is a legislative function").

¶ 53    We agree with the Commission that we need look no further than the Utilities Act itself, which not only governs the Commission but "also governs the courts, and their review of the Commission's decisions" (*People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 20), for the appropriate standard of review in this case. Section 10-201(e)(iv) of the Act, which sets out the only circumstances under which a decision of the Commission may be reversed by this court, provides as follows:

> "(iv) The court shall reverse a Commission rule, regulation, order or decision, in whole or in part, if it finds that:
>
> A. The findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision; or
>
> B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or
>
> C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or
>
> D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." 220 ILCS 5/10-201(e)(iv) (West 2018).

¶ 54    Here, the Attorney General does not argue that the Commission lacked jurisdiction or that its order violated a statutory or constitutional right. The only avenue for reversal available, then, is for the Attorney General to demonstrate that the Commission's findings were not supported by substantial evidence. This is a heavy burden. Although "substantial evidence" must be something more than "a mere scintilla of proof" (*Black Hawk Motor Transit Co. v. Illinois Commerce Comm'n*, 383 Ill. 57, 69 (1943)), it need not rise even to the level of a preponderance of the evidence. *City of Elgin v. Illinois Commerce Comm'n*, 2016 IL App (2d) 150047, ¶ 25. Substantial evidence exists "if a reasoning mind would accept the evidence as sufficient to support the challenged finding." *Id.* For reversal to be warranted, it is not enough that the evidence *could* support a different conclusion; rather, "it must be shown that the opposite conclusion is clearly evident." *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994).

¶ 55    This standard reflects the reality that courts are generally far less equipped than the Commission to design and update ratemaking schemes in accordance with the Act. See *People ex rel. Madigan*, 2015 IL 116005, ¶ 22 (noting that, in appeals like this one, the reviewing court's authority "is deferential by statute" but "also by nature" and acknowledging that "[W]e are judges, not utility regulators. Though we are free to disagree with the Commission on what the Act means [citation], we remain hesitant to disregard how the Commission applies it [citation]."). "Because of its complexity and [the] need to apply informed judgments, rate design is uniquely a matter for the Commission's discretion." *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 445 (1993). And it is one that "the General Assembly has entrusted to the Commission, and not to the courts." *People ex rel. Madigan*, 2015 IL 116005, ¶ 23.

¶ 56    Thus, in considering the two issues raised in this appeal, we look only to whether the Commission's order was supported by substantial evidence. Having said this, we also fully agree with the Attorney General's statement in his reply brief that "any dispute over whether to review the [Commission's] order for clear error or substantial evidence is not outcome determinative because both standards require a reasoned basis for the Commission's decision."

¶ 57                    C. Amortization of Unprotected Property-Related EDIT

¶ 58    The Attorney General argues that this court should reverse the Commission's decision to adopt a 39.47-year amortization period for unprotected property-related EDIT because "depending on how its order is interpreted, [the Commission] either based its decision on a legally erroneous premise about the source of EDIT or failed to consider the interests of the customers who funded the EDIT." ComEd and the Commission argue that the selection of an appropriate amortization period was a decision falling within the Commission's broad discretion, which was made following the evaluation of complex evidence and policy considerations, and that there is no compelling reason why the Commission should have adopted the Attorney General's five-year proposal.

¶ 59    We begin by noting that the Commission devoted a significant portion of its final order—over 14 single-spaced pages—to this issue. It first set out at length the positions of ComEd and the Commission's staff in favor of a 39.47-year amortization period based on ARAM and the positions of the Attorney General and IIEC/CUB in favor of a 5-year amortization period. The Commission then explained why it was disinclined to overturn its decision, made just one year earlier, to adopt the 39.47-year period. It stated:

> "The [Attorney General] and IIEC/CUB rely on many of the same arguments and reasoning that the Commission previously considered and rejected. The [Attorney General] and IIEC/CUB have not provided any new facts or governing law that would support a drastic change from the Commission's prior decision. Moreover, the Commission notes and agrees with ComEd's and [Commission] Staff's concerns that re-litigating this same issue over the next approximately 38 years (the remainder of the previously approved amortization period) would be a waste of resources.
>
> Here, as in the 18-0808 Order, the Commission finds that an amortization period for unprotected property-related EDIT that is calculated using ARAM aligns the amortization of EDIT with the underlying assets and is reasonable and equitable. As [Commission] Staff points out, this method is consistent with cost of service ratemaking principles that try to allocate annual costs to ratepayers using the utility

service during each annual period. The Commission agrees with ComEd and [Commission] Staff that using ARAM for EDIT ensures that the same customers who are paying over time for the underlying assets also realize benefits of the lower tax rates. The Commission therefore rejects the [Attorney General]'s recommended 5-year amortization period for EDIT."

¶ 60 The Attorney General first suggests that the Commission's order might rest on the incorrect premise that the ADIT that became EDIT with the enactment of the TCJA was not funded by ratepayers. In his brief, the Attorney General states that "[w]hile the Commission did not specify whether it had determined that EDIT was funded by ratepayers, it suggested that its decision was based on the same reasoning as its [2018] order," in which the Commission had concluded, among other things, that "customers do not pay for ADIT because they receive an equal credit of current tax expense that negates this 'payment.' " See *Commonwealth Edison*, Ill. Comm. Comm'n No. 18-0808, at 61. Citing several decisions of this court, the Attorney General insists that such a finding contradicts established precedent.

¶ 61 ComEd argues in response that it presented considerable expert accounting evidence on this question and insists that the Commission did find as a factual matter, in the 2019 rate update proceeding just as it had in the 2018 proceeding, that ratepayers do not fund ADIT and are thus not owed EDIT as a refund. ComEd contends both that the cases the Attorney General cites for the premise that ADIT represents money that the utility has already collected are inapplicable because they dealt with different rate making structures and accounting methodologies and also that those cases are not binding on what is essentially a question of fact, rather than one of legal precedent.

¶ 62 We need not resolve this part of the controversy, since it is clear to us that in its 2019 order—which is the only order that is before us on appeal—the Commission did *not* rely on a conclusion that ADIT/EDIT is not ratepayer-funded. Indeed, the Commission staff specifically noted that the Commission did not have to decide this issue because even if it were to accept that ADIT/EDIT is money already paid by the ratepayers, the longer amortization period proposed by ComEd should still be used because it (1) was consistent with the decision the Commission had made on that issue the prior year, (2) would ensure that amortization aligned with the life of the asset that gave rise to the deferred taxes, and (3) would permit the tax savings resulting from the TCJA's tax reductions to offset likely future tax increases.

¶ 63 We reject the Attorney General's suggestion that it can be inferred, merely from the Commission's reference to its 2018 order, that the Commission was again concluding in 2019 that ADIT/EDIT is not ratepayer funded. Indeed, the Commission's 2019 order, which specifically includes some of the reasons articulated in its 2018 order, plainly omits any finding regarding the source of ADIT/EDIT. The Attorney General chose not to appeal from the Commission's 2018 order. We agree with the Commission that our focus in *this* appeal must be on the reasons the Commission gave in its 2019 order and whether those reasons are supported by substantial evidence.

¶ 64 The Attorney General argues, in the alternative, that, even if the Commission's 2019 order did not rest on an incorrect assumption about whether ADIT/EDIT is ratepayer funded, its decision to adopt the 39.47-year amortization period was unreasonable. The Commission, however, provided several reasons why the amortization period it used was reasonable.

¶ 65 One reason cited by the Commission for that decision was its desire to maintain a consistent approach. When the Attorney General called on the Commission to reconsider its selection of

a 39.47-year amortization period, that timeframe had already been implemented, and rates based on that decision had been calculated, charged, and collected from customers for a number of months. To abandon that approach in favor of a significantly shorter amortization period would, as the Commission itself noted, have represented a drastic change and an encouragement to constantly relitigate the issue over the life of the amortization period. Although the Commission is not bound by principles of *res judicata* (*Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 715 (1997)), its orders are "entitled to less deference when the Commission drastically departs from past practice" (*Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997)). The desire to promote consistency, predictability, and finality in administrative decisions was, in our view, one reasoned basis for the Commission's decision to stand by the amortization period it approved in 2018.

¶ 66        The Commission also made clear that even if it were making this decision for the first time, a longer amortization rate was still preferable under the circumstances of this case. It explained that the goal of aligning the amortization period with the relatively lengthy remaining useful life of the underlying assets was an attempt to ensure that the same customers who would pay overtime for the assets would also realize the benefits of the reduced tax rates. This approach was not intended to favor future ComEd customers over current ones, but to balance the interests of all affected customers.

¶ 67        Also detailed at length in the Commission's order was its staff's explanation that the 39.47-year amortization period will preserve an EDIT balance that can be used in the future to partially offset tax increases. As Ms. Trost observed, such increases are not unlikely, given that the current maximum corporate income tax rate of 21% is the lowest since 1939.

¶ 68        In sum, the Commission articulated multiple reasonable bases for its decision and had before it compelling expert testimony supporting the approach that it adopted. The most we can conclude from the Attorney General's arguments is that other reasonable approaches may also have been supported by the evidence. But arguments on appeal urging nothing more than "a reweighing of conflicting expert opinion that was resolved by the Commission" do not support reversal by this court. See *City of Chicago v. Illinois Commerce Comm'n*, 133 Ill. App. 3d 435, 445 (1985) (affirming an order of the Commission where "[t]he gist" of the appellants' "long, detailed and often technical argument" was "simply that its witnesses and exhibits [were] more worthy of belief" (internal quotation marks omitted)). The Attorney General has not met its burden of establishing that the Commission's order was unsupported by substantial evidence.

¶ 69        The relevant case law compels no other result. The Attorney General points to cases where the Commission has selected and our courts have approved shorter amortization periods. However, as we have long recognized, the Commission has the expertise to adopt different amortization periods depending on the myriad factors it must consider. In *Business & Professional People for the Public Interest*, 146 Ill. 2d at 258, our supreme court affirmed the Commission's decision to amortize unprotected property-related EDIT over a three-year period because it was "fair and reasonable to return these excess ADITs to the ratepayers who actually paid this money to the company." The court concluded that this was a reasoned basis for the Commission's decision and that its order was thus not arbitrary or unsupported by the evidence. *Id.* at 258-59. What the *Business & Professional People for the Public Interest* court

- 14 -

did *not* say, however, was that this was the only reasonable conclusion the Commission could have reached.

¶ 70 In *Central Illinois Public Service*, decided shortly after our supreme court's decision in *Business & Professional People for the Public Interest*, we affirmed the Commission's decision to return unprotected property-related EDIT, not over the three-year period that our supreme court had affirmed in *Business & Professional People for the Public Interest*, but over the much longer remaining useful life of the assets, as it did in this case. See *Central Illinois Public Service*, 243 Ill. App. 3d at 437-40. We accepted the Commission's position in that case that its decision in *Business & Professional People for the Public Interest* to impose a shorter amortization period had "resulted from the particular facts of that case" and that it had never established "a general practice or policy of returning [EDIT] to ratepayers over [such a short] period." *Id.* at 439. We held that Commission's decision to use a longer amortization period was "fully supported by the record." *Id.* As we explained:

> "A court of review is not to reweigh evidence or make an independent determination of the facts; rather, our sole function here is to ascertain whether the final decision of the administrative agency is just and reasonable in light of the evidence presented. [Citations.] In light of the findings that the [method adopted by the Commission] returns excess ADITs over the remaining life of the assets to the ratepayers who benefit from and pay for that property and mitigates against the possible need for a rapid amortization of 'understated' deferred taxes in the event of future increase in the statutory increase [*sic*], and that [the challenger's] proposal was insensitive to the need for rate stability, we cannot say that the Commission's decision to adopt [this method] was improper." *Id.* at 439-40.

These are the same sorts of findings the Commission reached in this case, and we have no more reason to question them here than we did in *Central Illinois Public Service*. Although, as ComEd points out, the specific conclusions reached in some of these older cases, which involved a prior statutory ratemaking scheme that differed in significant ways from the one now in place, may no longer be directly applicable, we find them instructive for their deferential approach to assessing the Commission's findings.

¶ 71 As we have stated before, "[t]he Commission has broad discretion in deciding what is reasonable and it is not the position of this court to interfere with the functions and authority of the Commission, so long as [its] order demonstrates a sound and lawful analysis of the problems encountered." *Camelot Utilities, Inc. v. Illinois Commerce Comm'n*, 51 Ill. App. 3d 5, 9-10 (1977). Here, the Commission's order demonstrates just such an analysis. Its decision establishing a 39.47-year amortization period for ComEd's unprotected property-related EDIT was supported by the expert testimony of Mr. Newhouse and Ms. Trost, as outlined above. That decision coincided with the recommendations of the Commission's staff and was consistent with the Commission's prior approach regarding that issue. A reasoning mind would accept the evidence the Commission relied on as sufficient to support its adoption of this time period, and we cannot say that the correctness of the Attorney General's competing proposal is clearly evident. *City of Elgin*, 2016 IL App (2d) 150047, ¶ 25; *Continental*, 269 Ill. App. 3d at 171.

¶ 72          D. Inclusion of Microgrid Plant Additions Initially Projected for 2019

¶ 73          As noted above, EIMA requires the Commission to conduct a formula rate update each year that involves the final reconciliation of a participating utility's revenue requirement for the prior rate year—for which actual costs will then be known—as well as an estimation, based on projected costs, of its revenue requirement for the following year. 220 ILCS 5/16-108.5(d)(1) (West 2018). ComEd was thus required to file by May 1, 2019, a reconciliation of its actual costs for 2018 and a forecast of its projected costs for 2019, from which its rates for 2020 would be calculated. The Attorney General argues that three plant additions associated with the Microgrid Project should not have been included in the calculation of ComEd's 2020 rates because those rates were, by statute, to be based on the utility's 2019 costs, and the plant additions in question did not actually go into effect until 2020.

¶ 74          The parties do not dispute that the challenged plant additions *were* expected to go live in 2019 when ComEd's 2019 forecast was completed and filed. Nor does the Attorney General take issue with the Commission's contention that the Utilities Act does not specifically require a utility to update its forecast during formula rate update proceedings. The Attorney General argues, however, that when it becomes apparent to everyone involved during the pendency of the formula rate update proceeding that certain costs will not be incurred during the filing year, then it is a simple matter—in keeping with the Commission's duty to ensure that the rates it approves are just, reasonable, and based on prudently incurred costs—to omit those projected costs from the final formula rate update calculations. In the Attorney General's view, the approved rates should be as accurate as possible at the moment they are approved.

¶ 75          The Commission took a much different view in its order, stating:

     "A forecast, by its very nature, involves uncertainty. This is a lengthy proceeding, and as the year goes by, ComEd would inherently have a better understanding of which plant additions may or may not be placed into service by 2019. However, the Act does not require ongoing updates to the value of projected plant additions throughout the [formula rate update] proceeding. What the Act does provide is a way for the uncertainty in any forecast of projected plant additions to be reconciled and the customers of a utility made whole for any difference between forecasted and actual costs. 220 ILCS 5/16-108.5(d) [(West 2018)]. This reconciliation mechanism provides a balanced means of addressing any differences between forecasted and actual costs.

     The Commission agrees with ComEd that if the Commission adopted [the Attorney General]'s request to remove the contested plant additions, it may lead to a counter-productive expansion of contested issues during the later stages of future [formula rate update] proceedings. The Commission finds that there is no evidence that [the] projected plant additions were improperly included in ComEd's forecasted plant additions and therefore the Commission approves the value of [those projects] as set out in ComEd's rebuttal testimony."

¶ 76          We find the Commission's justifications to be reasonable. Given the length of the proceedings involved, the formula rate update process established by EIMA has already placed utilities and the Commission in a near-constant state of projection and reconciliation. Here, ComEd submitted its 2019 projections in April 2019, and the Commission did not issue its final order until December 4 of that year, less than a month before the rates it approved were to take effect. By that time, it was only a matter of months before ComEd's next formula rate update would be due, including a reconciliation of its actual costs for 2019. We can well

understand how requiring even more frequent updates and adjustments could hamper the Commission's ability to approve rates in a timely fashion.

¶ 77 Section 16-108.5(d)(1) of the Act makes clear that the intent of the reconciliation process is "to ultimately reconcile the revenue requirement reflected in rates for each calendar year *** with what the revenue requirement *** would have been had the actual cost information for the applicable calendar year been available *at the filing date*." (Emphasis added.) *Id.* We agree with ComEd that the Commission reasonably interpreted and applied the Utilities Act in resolving this question and reasonably concluded that the statutory reconciliation process was the appropriate mechanism for dealing with new information that may come to light after the utility has filed its projected costs and while formula rate update proceedings are ongoing.

¶ 78                                   IV. CONCLUSION

¶ 79 Having considered the evidence and arguments presented to the Commission, as well as the parties' arguments on appeal, we find that the Commission's conclusions that (1) ComEd's unprotected property-based EDIT should be amortized over a period of 39.47 years and (2) the statutory reconciliation process is the proper mechanism to address changes to projected plant additions arising during formula rate update proceedings were both supported by substantial evidence. Reasoning minds would accept the evidence in support of these conclusions, and the Attorney General has not convinced us that the opposite conclusions are clearly evident. Accordingly, we affirm the Commission's December 4, 2019, order approving ComEd's delivery service charges for 2020.

¶ 80 Affirmed.