NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 200105-U

NO. 4-20-0105

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 19, 2021
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) | Direct Review of Order of the Illinois Commerce |
| Petitioner, | ) | Commission |
| v. | ) | No. 19-0436 |
| THE ILLINOIS COMMERCE COMMISSION; AMEREN ILLINOIS COMPANY; CITIZENS UTILITY BOARD; UNIVERSITY OF ILLINOIS; LIBERTY STEEL AND WIRE; AIR PRODUCTS & CHEMICALS COMPANY; MARATHON PETROLEUM COMPANY; PHILLIPS 66; ARCHER-DANIELS-MIDLAND COMPANY; TATE & LYLE INGREDIENTS AMERICAS, INC.; VISCOFAN USA, INC.; AND CCPS TRANSPORTATION LLC, as Members of the Illinois Industrial Energy Consumers, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | | |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding the Commission's final order was supported by substantial evidence where it (1) adopted a 35-year amortization period for returning unprotected property-related EDIT to Ameren's ratepayers and (2) excluded from rate base CWIP-related ADIT where the corresponding CWIP costs were not yet in rate base.

¶ 2    On April 18, 2019, Ameren Illinois Company (Ameren) filed with the Illinois

Commerce Commission (Commission) its eighth annual update of cost inputs to its

performance-based formula pursuant to section 16-108.5(d) of the Public Utilities Act (Utilities

Act), commonly referred to as the Energy Infrastructure Modernization Act (Modernization Act) (220 ILCS 5/16-108.5(d) (West 2018)). Ameren proposed a net revenue requirement of $1,009,912,000, to be recovered in rates effective in 2020. The Commission opened a docketed proceeding to investigate the "prudence and reasonableness" of Ameren's updated cost inputs and the corresponding charges to be recovered during 2020. The Attorney General of the State of Illinois (Attorney General) appeared on behalf of the People of the State of Illinois, and the Citizens Utility Board (CUB) and the Illinois Industrial Energy Consumers (IIEC) (jointly, IIEC/CUB), both intervened in the matter. Commission Staff (Staff) also participated in the proceedings.

¶ 3        On December 16, 2019, following an evidentiary hearing, briefing by all parties, and oral argument, the Commission issued its final administrative order. In its final order, the Commission made numerous ratemaking determinations that resulted in the approval of Ameren's revenue requirement to be recovered in rates in 2020.

¶ 4        On January 3, 2020, the Attorney General filed a verified application for rehearing on two issues: (1) the amortization of excess deferred income taxes (EDIT) and (2) the treatment of construction work in progress (CWIP) related to accumulated deferred income taxes (ADIT). On January 21, 2020, the Commission denied the verified petition for rehearing.

¶ 5        On appeal, the Attorney General challenges two of the Commission's decisions in its final order. Specifically, the Attorney General argues the Commission erred by (1) approving a 35-year amortization period for returning unprotected property-related EDIT to Ameren's ratepayers and (2) failing to deduct CWIP-related ADIT from rate base. We affirm the Commission's order.

¶ 6                                I. BACKGROUND

¶ 7                                    A. Modernization Act

¶ 8                                    1. *Participating Utilities*

¶ 9          "In 2011, the General Assembly passed the Modernization Act (220 ILCS

5/16-108.5 (West 2012)), as a provision of the Utilities Act (220 ILCS 5/1-101 to 22-503 (West

2012))." *Ameren Illinois Co. v. Illinois Commerce Com'n.*, 2013 IL App (4th) 121008, ¶ 8, 2

N.E.3d 1087. "The Modernization Act applies to electric utilities or combination gas and

electric utilities serving more than 1 million customers in Illinois that voluntarily undertake to

create customer assistance programs and invest in an infrastructure program that creates Illinois

jobs." *Id.* (citing 220 ILCS 5/16-108.5(b) (West 2012)). "The incentive for utility companies to

participate in this program is that the statute allows the company to recover its expenditures

through the ratemaking process[, including, but not limited to, the performance-based formula

rate]." *Id.* (citing 220 ILCS 5/16-108.5(b) (West 2012)). Ameren is a "participating utility"

under section 16-108.5(b) of the Modernization Act (220 ILCS 5/16-108.5(b) (West 2018)). See

*Ameren Illinois Co.*, 2013 IL App (4th) 121008, ¶¶ 8-10.

¶ 10                                   2. *Performance-Based Formula Rate*

¶ 11         Under section 16-108.5(c) of the Modernization Act,

               "A participating utility may elect to recover its delivery

               services costs through a performance-based formula rate approved

               by the Commission, which shall specify the costs components that

               form the basis of the rate charged to customers with sufficient

               specificity to operate in a standardized manner and be updated

               annually with transparent information that reflects the utility's

               actual costs to be recovered during the applicable rate year, which

is the period beginning with the first billing day of January and extending through to the last billing day of the following December." 220 ILCS 5/16-108.5(c) (West 2018).

"The performance-based formula rate shall be implemented through a tariff filed with the Commission consistent with the provisions of this subsection (c) that shall be applicable to delivery services customers." 220 ILCS 5/16-108.5(c) (West 2018). The performance-based formula rate approved by the Commission shall "provide for the recovery of the utility's actual costs of delivery services that are prudently incurred and reasonable in amount consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(1) (West 2018). On January 3, 2012, Ameren filed with the Commission its performance-based formula rate tariff, "Rate MAP-P Modernization Action Plan—Pricing Tariff (Rate MAP-P), initiating Docket No. 12-0001. The docket established the terms of the formula." See *Ameren Illinois Co.*, 2013 IL App (4th) 121008, ¶¶ 8-10.

¶ 12                                    3. *Annual Rate Updates and Reconciliations*

¶ 13            "Subsequent to the Commission's issuance of an order approving the utility's performance-based formula rate structure and protocols, and initial rates under subsection (c) of this Section, the utility shall file, on or before May 1 of each year, with the Chief Clerk of the Commission its updated costs inputs to the performance-based formula rate for the applicable rate year and the corresponding new charges." 220 ILCS 5/16-108.5(d) (West 2018).

"The inputs to the performance-based formula rate for the applicable rate year shall be based on final historical data reflected in the utility's most recently filed annual [Federal Energy Regulatory Commission] FERC Form 1 plus projected plant

- 4 -

additions and correspondingly updated depreciation reserve and expense for the calendar year in which the inputs are filed. The filing shall also include a reconciliation of the revenue requirement that was in effect for the prior rate year (as set by the cost inputs from the prior rate year) with the actual revenue requirement for the prior rate year (determined using a year-end rate base) that uses amounts reflected in the applicable FERC Form 1 that reports the actual costs for the prior rate year." 220 ILCS 5/16-108.5(d)(1) (West 2018).

¶ 14   Section 16-108.5(d) of the Modernization Act further states, "Within 45 days after the utility files its annual update of cost inputs to the performance-based formula rate, the Commission shall have the authority, either upon complaint or its own initiative, but with reasonable notice, to enter upon a hearing concerning the prudence and reasonableness of the costs incurred by the utility to be recovered during the applicable rate year that are reflected in the inputs to the performance-based formula rate derived from the utility's FERC Form 1. During the course of the hearing, each objection shall be stated with particularity and evidence provided in support thereof, after which the utility shall have the opportunity to rebut the evidence. Discovery shall be allowed consistent with the Commission's Rules of Practice, which Rules shall be enforced

by the Commission or the assigned administrative law judge." 220
ILCS 5/16-108.5(d) (West 2018).

"In a proceeding under this subsection (d), the Commission shall enter its order no later than the earlier 240 days after the utility's filing of its annual update of cost inputs to the performance-based formula rate or December 31." 220 ILCS 5/16-108.5(d) (West 2018).

¶ 15                                          B. Procedural History

¶ 16            1. *Ameren's 2020 Formula Rate Update and Revenue Requirement*

¶ 17            On April 18, 2019, Ameren filed with the Commission its eighth annual update of cost inputs to its performance-based formula pursuant to section 16-108.5(d) of the Modernization Act (220 ILCS 5/16-108.5(d) (West 2018)). Ameren proposed a net revenue requirement of $1,009,912,000, to be recovered in rates effective in 2020. Subsequently, the Commission opened a docketed proceeding to investigate the "prudence and reasonableness" of Ameren's updated cost inputs and the corresponding charges to be recovered during 2020. The Attorney General appeared on behalf of the People of the State of Illinois, and IIEC/CUB both intervened in the matter. Staff also participated in the proceedings.

¶ 18            At a September 4, 2019, evidentiary hearing before duly appointed Administrative Law Judges (ALJ), the parties submitted testimony and other evidence on the issues. Following the evidentiary hearing, Ameren, Staff, the Attorney General, and IIEC/CUB filed briefs on the contested issues. On October 4, 2019, the parties had the option of filing Statements of Position and Suggested Conclusions on the contested issues, and jointly filed an Agreed Draft Order on all other issues, for the ALJs' consideration. On October 30, 2019, the ALJs served a proposed order electronically to the parties. On December 3, 2019, the Commission conducted oral argument on the issues.

¶ 19       The parties contested two issues: (1) the appropriate amortization period of

Ameren's unprotected property-related EDIT resulting from a reduction in the federal corporate

income tax rate and (2) Ameren's exclusion from rate base of CWIP-related ADIT (*i.e.*, plant

assets that have not yet been placed into utility service).  What follows is a brief overview of the

contested issues and the parties' positions on the contested issues.

¶ 20                              a.  Amortization Period of EDIT

¶ 21       "ADIT quantifies the income taxes that are deferred when the tax law provides for

deductions with respect to an item in a year other than the year that the item is treated as an

expense for financial reporting purposes."  (Internal quotation marks omitted.)  *Ameren Illinois*

*Co.*, 2013 IL App (4th) 121008, ¶ 34 (quoting *Ameren Illinois Co. v. Illinois Commerce*

*Comm'n*, 2012 IL App (4th) 100962, ¶ 11, 967 N.E.2d 298).  Specifically, "ADIT represents

taxes payable in the future that provide a source of funds the utility can use until such time the

taxes become due." *Id.*

¶ 22       In 2017, the State of Illinois income tax rate increased from 7.75% to 9.5%, and

the Tax Cut and Jobs Act of 2017 (TCJA) reduced the federal business income tax rate from

35% to 21%, effective December 31, 2017.  See Pub. L. 115-97, 131 Stat. 2054 (2018).

> "[T]he reduction in the income tax rate enacted as part of the
>
> [TCJA] altered the amount of the anticipated repayment liability.
>
> When, eventually, the higher taxable income is produced, it will be
>
> taxed at 21%, not the higher rate in effect in the past.
>
> Consequently, some portion of the ADIT reserve previously
>
> recorded on the presumption that it would be taxed at the higher

rate of 34 or 35% is rendered unnecessary for that purpose. This

portion is excess deferred income taxes, or EDIT."

The Illinois tax increase also altered the state ADIT repayment liability, changed the state ADIT

reserve, and generated an offset to the federal EDIT.

"Under the TCJA , a defined type of property-related [also,

commonly referred to as plant-related] EDIT, the 'excess tax

reserve' or 'protected' EDIT, must be flowed through to customers

no faster than the underlying timing differences reverse using

Average Rate Assumption Method (ARAM) [which currently

approximates 35 years] or, if the utility doesn't have the records

necessary to apply the ARAM, ratably over the remaining life of

the property. The remainder of the EDIT balance is 'unprotected'

EDIT, which can be flowed through to customers at whatever rate

the regulator [Commission] deems reasonable and appropriate."

¶ 23                                    b. CWIP-Related ADIT

¶ 24          Utilities record the costs incurred for assets under construction as "construction

work in progress," or CWIP. Those costs consist of the total balances of work orders for electric

distribution and general and intangible plant that has not yet been placed in service, including

capitalized project costs such as land, fixtures, regulatory expense, engineering, surveys, and

other items that are incurred while a project is under construction. These capital project costs are

typically excluded from rate base until the project is placed into service. However, they do

accrue an "allowance for funds used in construction," or AFUDC, to reflect the cost of debt and

equity funds used to finance construction. Those accrued AFUDC funds are added to the capital

cost of the project. Once the project is complete, the asset is transferred from CWIP to Plant in Service, at which time the assets are in rate base and earn a cash return.

¶ 25        There can be ADIT associated with CWIP as well. Prior to the date the CWIP project is placed in service, tax law permits a utility to deduct all or a portion of the costs incurred to invest in utility plant assets, while the assets must be capitalized and depreciated over time for financial statement purposes. This results in a book-tax timing difference and related ADIT. This ADIT is produced by expenditures that, as of the end of the rate setting period, remain as CWIP and so are not reflected in rates. When the CWIP project is completed and placed into service, that plant and its accrued AFUDC is included in rate base. At that time, the ADIT related to the plant's book and tax basis differences is also included as a liability that offsets rate base.

¶ 26        Ameren's rate base included approximately $3,110,000 of CWIP on which AFUDC was not capitalized, or approximately 1% of the company's total CWIP, as of December 31, 2018. For this small amount of CWIP in rate base, generally associated with minor CWIP projects, Ameren included the related ADIT in rate base as well. The remaining 99% of Ameren's total CWIP balance was not included in rate base. Because the 99% of Ameren's CWIP was excluded from rate base, Ameren similarly excluded the CWIP-related ADIT for those CWIP investments from rate base.

¶ 27                c. The Parties' Positions on the Contested Issues

¶ 28        As to the issue of the appropriate amortization period of Ameren's unprotected property-related EDIT, the Attorney General argued the amortization of the unprotected property-related EDIT should be over a five-year period, rather than the 35-year period proposed by Ameren. The Attorney General based its position on testimony provided by witness, Michael

L. Brosch, a consultant in the field of public utility regulation. Brosch testified that because "deferred taxes were collected from ratepayers through utility rates over many prior years, and are no longer needed to pay future federal income taxes[,]" equity demands the EDIT be returned to customers on an expedited basis. A five-year amortization period makes it "more likely the same ratepayers who previously paid the EDIT will benefit from the refunding of EDIT[.]"

¶ 29     Ameren recommended using the ARAM method for unprotected property-related EDIT for an amortization period of 35 years where the ARAM period or its 35-year proxy aligns the amortization of EDIT with the useful life of the underlying assets. Further, "amortizing EDIT over the life of the asset ensures that current and future customers who pay for an asset over its useful life (through depreciation) continue to receive the offsetting benefit of an EDIT refund as they pay." Ameren based its position on testimony provided by witness, Ronald D. Stafford, Ameren's Director of Regulatory Accounting.

¶ 30     IIEC/CUB provided its recommendation through witness, Michael Gorman, a consultant in the field of public utility regulation. IIEC/CUB recommended a seven-year amortization period. Similar to the Attorney General's position, Gorman provided Ameren should return EDIT to the same customers that contributed to it as quickly as possible. Both the Attorney General and IIEC/CUB argued for a shorter amortization period where they recognized EDIT as ratepayer funded, where Ameren did not.

¶ 31     Staff agreed with Ameren's 35-year amortization period and based its position on testimony provided by witness, Theresa Ebrey, a certified public accountant in the Commission's Financial Analysis Division. "Ebrey supported Ameren's amortization period of 35 years for EDIT based on the remaining useful life for the unprotected property-related EDIT." Staff supported Ameren's position that "amortizing EDIT over the life of the assets ensure[d] the

- 10 -

current and future customers pay a smoother, normalized cost for the asset over time." Staff also argued that a longer, ARAM-based amortization period can benefit ratepayers in two additional ways if tax rates increase in the future. First, Ebrey explained a 35-year amortization period would help offset the effect of a future tax increase because any remaining EDIT balance would offset the deferred tax deficiency created by the tax increase. Second, Ebrey explained a longer amortization period can act as a cushion against a spike in delivery services rates if the deferred tax deficiency is collected too quicky from ratepayers.

¶ 32    As to the issue of CWIP-related ADIT, Ameren excluded approximately 99% of its CWIP balance from rate base. Consistent with ratemaking principles, Ameren excluded the CWIP-related ADIT for those projects from rate base as well. Ameren provided, through Stafford, evidence demonstrating that (1) it does not earn a cash return on CWIP excluded from rate base and (2) Ameren's proposal provides the benefit of a rate base deduction for CWIP-related ADIT to those ratepayers that fund the underlying assets. Ameren urged the Commission to stick with the general practice of excluding from rate base CWIP-related ADIT where the corresponding CWIP is not yet placed in rate base until the project is in service.

¶ 33    The Attorney General argued that Ameren should include its CWIP-related ADIT in rate base so that "consumers realize the benefit of the ADIT adjustment." Specifically, the Attorney General argued "because CWIP accounting puts the gross costs (including AFUDC) into rate base without an offset for ADIT generated by CWIP investment," the Commission should reduce Ameren's rate base by the amount of CWIP-related ADIT or "ratepayers will never see reduction to rate base that they are entitled to for ADIT generated by CWIP projects and rates will include a return on ADIT despite the fact that ADIT is not investor money."

- 11 -

¶ 34          The Attorney General's witness, Brosch, cited a decision of the Missouri Public

Service Commission, Case No. 2012-0166, where the Missouri Commission adopted Brosch's

position to require Ameren Missouri in a general rate case to include CWIP-related ADIT

balances in the electric utility's rate base.  Brosch recommended the Commission here "make the

same findings approved in Missouri" and require Ameren to include the remaining 99% of

CWIP-related ADIT in its rate base.

¶ 35                              2. *The Commission's Final Order*

¶ 36          On December 16, 2019, the Commission issued its final administrative order.  In

its final order, in relevant part, the Commission recounted the parties' positions regarding the

two contested issues: (1) the amortization of unprotected property-related-EDIT and (2) the

treatment of CWIP-related ADIT.  The Commission resolved both issues as follows.

¶ 37             a.  Amortization Period of Unprotected Property-Related EDIT

¶ 38          As to the first issue regarding the proper EDIT amortization period, the

Commission determined as follows:

> "All parties agree that the EDIT balances at issue in this
> docket should be refunded to customers.  The parties disagree,
> however, about the appropriate amortization period that should be
> applied to [Ameren's] 'unprotected' plant-related EDIT, where the
> ARAM methodology is not required, but permitted.  [Ameren]
> proposes, and Staff concurs, that the Commission should apply a
> consistent amortization period for all plant-related deferred taxes,
> both protected and unprotected.  Specifically, [Ameren] argues that
> the Commission should approve using ARAM for all

- 12 -

property-related excess deferred taxes whenever ARAM is required by law or is feasible. For those items where [Ameren's] tax systems cannot perform the necessary calculations for ARAM, a 35-year amortization can be used as a proxy for the remaining useful life of the assets. [The Attorney General] and IIEC/CUB argue for a shorter amortization period—five and seven years, respectively."

¶ 39 The Commission stated that it addressed this issue less than one year prior in *In re Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 18-0808 (Order-Final Dec. 4, 2018). The Commission noted "many of the same arguments raised here by the [Attorney General] and IIEC/CUB were raised by the [Attorney General] and CUB in Docket No. 18-0808, and those arguments were considered and rejected by the Commission." The Commission found Commonwealth Edison's longer amortization period for unprotected plant-related EDIT was reasonable, explaining,

"If EDIT is reversed more rapidly than the rate at which depreciation expense and the original ADIT gets reflected in rates, customers in early years receive a benefit that is denied to customers in later years even though those customers will be paying for the underlying asset and the related ADIT." *Id.* at 44.

The Commission found the same concern regarding "intergenerational inequality" at issue here.

¶ 40 The Commission further found,

"The [Attorney General] and IIEC/CUB have not demonstrated that a different outcome is warranted here. While

- 13 -

the Commission agrees with the [Attorney General] that EDIT balances should be returned to the customers and returned in a manner that benefits the customers, the Commission is not persuaded that the [Attorney General] proposed five-year amortization period, or the IIEC/CUB proposed seven-year period, will provide such benefit. Neither the [Attorney General] nor IIEC/CUB provide a clear methodology to support a specified period, or clear explanation how a short period will benefit the customers overall, as compared to the 35-year period derived from the commonly accepted ARAM method. The [Attorney General] and IIEC/CUB argument that a shorter amortization period will ensure that the same customers that funded the EDIT balances will enjoy the return is not supported by the evidence. Also, the [Attorney General] and IIEC/CUB proposals overlook the interests of the customers in the long run, those customers that will continue paying for the underlying assets. The Commission is tasked with balancing interest of all customers, in the short-term and long-term, and must ensure that EDIT balances are refunded in a manner that is equitable and benefits all customers. Accordingly, the Commission finds that the record supports [Ameren's] argument that its use of the ARAM method to arrive at a 35-year amortization period for unprotected plant-related EDIT is reasonable and equitable. Consistent with that finding, the

Commission approves [Ameren's] proposal to use the ARAM

methodology for all property-related excess deferred taxes, both

protected and unprotected, or a 35-year proxy where ARAM is not

feasible."

¶ 41　　　　The Commission also rejected the Attorney General's contention that ADIT and

EDIT are ratepayer funded, thereby justifying an accelerated amortization period. The

Commission noted it also previously rejected this contention in *Commonwealth Edison*.

Specifically, the Commission stated,

"As [Ameren] explains, [Ameren's] income tax expense is

reflected in its revenue requirement at statutory tax rates. If taxes

are deferred, ratepayers enjoy the benefit of an offset to rate base

for the jurisdictional ADIT amounts and a reduced effective tax

rate. Thus, the deferral of taxes reduces the amount customers

would otherwise pay, and customers are not paying the full dollar

for dollar impact of deferred tax expense. Even when the deferred

tax amounts become excess with the reduction in federal income

tax rates, ratepayers have not supplied the full EDIT amount.

Consistent with its decision in Docket No. 18-0808, the

Commission again rejected the [Attorney General's] contention

that ratepayers funded the underlying ADIT.

　　　　The Commission finds the [Attorney General's] argument

that accelerated refunds make it more likely that ratepayers who

paid the pre-2018 statutory tax rate receive the (unprotected) EDIT

- 15 -

refund is speculative and not supported by empirical evidence in the record. There is no guarantee that pre-TCJA customers continue to be [Ameren] customers (or will be five years from now). Similarly, there are undoubtedly new [Ameren] customers who did not pay those pre-2018 tax rates. In the interest of equitable ratemaking, the Commission has previously determined that it is in the best interest of ratepayers to align the amortization of EDIT with the useful life of the underlying assets, allowing customers to pay a smoother, more normalized cost over time. The Commission sees no reason to depart from that practice now."

¶ 42                                   b. CWIP-Related ADIT

¶ 43          As to the second issue regarding the treatment of CWIP-related ADIT, the Commission determined as follows:

"It is undisputed that 99% of [Ameren's] CWIP in this proceeding is not included in rate base, and thus does not currently provide a return on, nor a return of, investment. The question before the Commission is whether it is appropriate to adopt the [Attorney General's] proposal to include in rate base the ADIT associated with that CWIP. [Ameren] contends that the [Attorney General]'s proposal is inconsistent with prior Commission practice and would result in an inequitable treatment of ADIT and its related cost items. The Commission agrees with [Ameren].

- 16 -

In Docket No. 14-0317, [Ameren] accepted Staff and the [Attorney General]'s proposals to remove ADIT assets and liabilities from rate base when the underlying cost item was not also in rate base, in order to ensure consistency between the ratemaking treatment of ADIT and its related cost items. In that case, the Commission approved the adjustment, finding the parties' treatment of the identified ADIT issues appropriate. The Commission finds that the same logic applies in this case, and the [Attorney General] has not demonstrated why the Commission should treat the CWIP-related ADIT in this case differently. It is undisputed that [Ameren] does not earn a cash return on its CWIP project costs until those projects are placed into service and included in rate base. At that time, ratepayers will begin to pay for those projects. And at that time, [Ameren] also includes the ADIT related to those CWIP investments as a liability that offsets rate base. The accrual of AFUDC until that point is immaterial because AFUDC does not provide a current cash return, a fact that the [Attorney General] does not contest.

The [Attorney General]'s proposal would reduce rates for current customers that do not fund those underlying CWIP projects and to whom the CWIP assets do not provide service. However, as the Commission recognized in Docket No. 14-0317, consistency requires that the tax benefit of ADIT should be reflected for

- 17 -

customers when the associated plant in service is in rate base. The

Commission notes that, consistent with this principle, [Ameren]

has included approximately 1% of its CWIP in rate base, and the

ADIT associated with that 1% of CWIP is also included in rate

base. This is equitable and provides a current tax benefit to those

customers that are funding those assets.

  The Commission finds the [Missouri Public Service

Commission] decision [in Case No. 2012-0166] unpersuasive here,

particularly where this Commission has examined this issue more

recently and come to the opposite result. The Commission

therefore rejects the [Attorney General]'s proposal to include

CWIP-related ADIT in rate base."

¶ 44  On January 3, 2020, the Attorney General filed a verified application for

rehearing. On January 21, 2020, the Commission denied the verified application for rehearing.

On February 24, 2020, the Attorney General filed a notice of appeal with the Commission and a

petition for review with this court.

¶ 45  This appeal followed.

¶ 46        II. ANALYSIS

¶ 47  On appeal, the Attorney General argues the Commission's December 16, 2019,

final order should be reversed where the Commission erred by (1) approving Ameren's proposal

to amortize unprotected property-related EDIT over 35 years, rather than the 5-year period

proposed by the Attorney General and (2) failing to deduct CWIP-related ADIT from Ameren's

rate base, causing ratepayers to impermissibly provide a return on those funds as a result.

- 18 -

¶ 48                              A. Ameren's Mootness Arguments

¶ 49          We first consider Ameren's argument that this appeal should be dismissed as

moot.  Ameren argues the Attorney General's appeal is moot because the 2020 rates established

by the Commission in its final order were superseded by new rates approved for 2021.

¶ 50          " 'Courts of review will not decide moot or abstract questions, will not review

cases merely to establish precedent, and will not render advisory opinions.' " *People ex rel.*

*Raoul v. Illinois Commerce Commission*, 2021 IL App (1st) 200366, ¶ 40 (quoting *Goral v.*

*Dart*, 2020 IL 125085, ¶ 76).  " 'An appeal is considered moot where it presents no actual

controversy or where the issues involved in the trial court no longer exist because intervening

events have rendered it impossible for the reviewing court to grant effectual relief to the

complaining party.' "  *Id.* (quoting *In re J.T.*, 221 Ill. 2d 338, 349-50, 851 N.E.2d 1, 7-8 (2006)).

¶ 51          Ameren asserts because new rates took effect in January 2021, the issues

challenged by the Attorney General in this appeal which are based on the 2020 rates "are no

longer subject to refund or adjustment."  In support of its argument, Ameren cites *Independent*

*Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90, 510 N.E.2d 850 (1987).  In

*Independent Voters*, the Illinois Supreme Court determined that certain expenses and deductions

allowed in the Commission's rate order were improper, but the court only invalidated those

portions of the rate order "from the time [the] court entered its judgment" until "the new rates

took effect" in January of the following year.  *Independent Voters of Illinois*, 117 Ill. 2d at

102-03.

¶ 52          The Attorney General argues this appeal is not moot, either because, even though

the 2020 rates were no longer in effect, any decision on the issue will necessarily affect future

rates or because the issues raised are reviewable under an established exception to the mootness doctrine. We agree.

¶ 53 As to the first issue—the amortization period approved by the Commission for unprotected property-related EDIT—the Attorney General correctly points out that this decision affected not just the rates set for 2020 but will continue to affect future rates. Effectual relief may still be granted because a reversal of that decision would affect rates going forward.

¶ 54 As to the second issue—the treatment of CWIP-related ADIT—the Attorney General argues the public interest exception to the mootness doctrine applies. A court may review an otherwise moot issue under that exception when "(1) the question presented is of a public nature; (2) an authoritative resolution of the question is desirable for the purpose of guiding public officers; and (3) the question is likely to recur." *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 9, 23 N.E.3d 351. While the exception is a narrow one and "requires a clear showing of each of its criteria" (*Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 13, 51 N.E.3d 788), we find the exception applies here.

¶ 55 First, the Commission decided a question of public nature when it concluded Ameren was not required to include CWIP-related ADIT in rate base until the corresponding CWIP was included in rate base when the project was placed into service. This was a decision that affected the electricity rates for Ameren customers across central and southern Illinois. While this issue directly affected only the rates Ameren charged those customers in 2020, the approach taken by the Commission could affect other formula rate update decisions in the future. Thus, it is not an issue that "uniquely applies only to a specific group of regulated entities for a specific project." *Id.* ¶ 14.

¶ 56    Second, an authoritative resolution of this issue is desirable to guide the Commission in future proceedings, particularly given the lack of case law on the effect of CWIP-related ADIT on rate base.  See *In re Shelby R.*, 2013 IL 114994, ¶ 22, 995 N.E.2d 990. Finally, we agree with the Attorney General this issue is likely to reoccur because a utility's formula rate is updated annually, and issues will continue to arise when new projects generate CWIP-related ADIT.  Further, we find support for our conclusion that the issues raised on appeal are not moot where the Commission filed a brief on the issues but has not joined in Ameren's mootness argument.

¶ 57    B. Standard of Review

¶ 58    Next, we address the parties' disagreement regarding the appropriate standard of review on appeal.  "The level of deference given to an administrative agency's decision typically depends on the nature of the issue resolved by the agency."  *People ex rel. Raoul*, 2021 IL App (1st) 200366, ¶ 50.  We review questions of law *de novo*.  *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 243, 902 N.E.2d 652, 660 (2009).  An agency's findings of fact will be reversed only if they are against the manifest weight of the evidence.  *Id.* "An agency's application of a rule of law to established facts is a mixed question of fact and law that will not be reversed unless it is deemed 'clearly erroneous.' "  *Id.* at 243-44 (quoting *Cinkus v. Village* of *Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211, 886 N.E.2d 1011, 1018 (2008)).  "A decision is clearly erroneous where, having considered the entire record, we are 'left with the definite and firm conviction that a mistake has been committed.' "  *People ex rel. Raoul*, 2021 IL App (1st) 200366, ¶ 50 (quoting *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board*, 224 Ill. 2d 88, 97-98, 862 N.E.2d 944, 950-51 (2007)).

¶ 59 The Attorney General argues our review of the Commission's order should be for clear error where the Commission resolved a mixed question of law and fact when it determined the legal effect of two sets of undisputed facts concerning EDIT amortization and CWIP-related ADIT. The Commission and Ameren respond that the clear error standard is not applicable because section 10-201 of the Utilities Act (220 ILCS 5/10-201 (West 2018)) requires this court to review the Commission's decisions for "substantial evidence."

¶ 60 "[O]ur supreme court has made clear that the matter of rate regulation is essentially one of *legislative control* and is not a judicial function." (Emphasis in original and internal quotation marks omitted.) *Raoul*, 2021 IL App (1st) 200366, ¶ 52; see also *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 59, 809 N.E.2d 1248, 1265-66 (2004); *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 472, 645 N.E.2d 946, 951 (1994). Thus, we agree with the Commission and Ameren that the Utilities Act not only governs the Commission but " 'also governs the courts, and their review of the Commission's decisions.' " *Raoul*, 2021 IL App (1st) 200366, ¶ 53 (quoting *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 20, 25 N.E.3d 587).

¶ 61 Section 10-201(e)(iv) of the Utilities Act sets out the circumstances under which a decision of the Commission may be reversed by this court, as follows:

"(iv) The court shall reverse a Commission rule, regulation, order or decision, in whole or in part, if it finds that:

A. The findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision; or

- 22 -

B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or

C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or

D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." 220 ILCS 5/10-201(e)(iv) (West 2018).

¶ 62 Here, the Attorney General does not argue the Commission lacked jurisdiction or that its order violated a statutory or constitutional right. Therefore, the only avenue for reversal is for the Attorney General to demonstrate that the Commission's findings were not supported by substantial evidence. "Substantial evidence exists 'if a reasoning mind would accept the evidence as sufficient to support the challenged finding.' " *Raoul*, 2021 IL App (1st) 200366, ¶ 54 (quoting *City of Elgin v. Illinois Commerce Comm'n*, 2016 IL App (2d) 150047, ¶ 25, 52 N.E.3d 631). "For reversal to be warranted, it is not enough that the evidence *could* support a different conclusion; rather, 'it must be shown that the opposite conclusion is clearly evident.' " *Id.* (quoting *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171, 645 N.E.2d 516, 523 (1994)).

¶ 63 The substantial evidence standard reflects the reality that courts are generally far less equipped than the Commission to design and update ratemaking schemes in accordance with the Utilities Act. *Id.* ¶ 55 (citing *People ex rel. Madigan*, 2015 IL 116005, ¶ 22 (noting that, in appeals like this one, the reviewing court's authority "is deferential by statute" but "also by

- 23 -

nature" and acknowledging that "[W]e are judges, not utility regulators.  Though we are free to disagree with the Commission on what the [Utilities] Act means [citation], we remain hesitant to disregard how the Commission applies it [citation].")).  " 'Because of its complexity and [the] need to apply informed judgments, rate design is uniquely a matter for the Commission's discretion.' "  *Id.* (quoting *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 421, 445, 610 N.E.2d 1356, 1372-73 (1993)).  "And it is one that 'the General Assembly has entrusted to the Commission, and not to the courts.' "  *Id.* (quoting *People ex rel. Madigan*, 2015 IL 116005, ¶ 23).

¶ 64      In considering the two issues raised on appeal, we look to whether the Commission's final order was supported by substantial evidence.  Having said this, we also agree with the Attorney General's statement in its reply brief that "whether the Commission's decision is reviewed for clear error or substantial evidence is not outcome determinative because both standards essentially require a reasoned basis supported by the evidence."

¶ 65      C.  Amortization of Unprotected Property-Related-EDIT

¶ 66      The Attorney General argues the Commission erred by approving a 35-year amortization period for unprotected property-related EDIT where the Commission's decision rested on an erroneous conclusion about the source of EDIT and untenable reasoning regarding the effect of a speedier refund.  Ameren and the Commission argue (1) the selection of an appropriate amortization period was a decision falling within the Commission's broad discretion, which was made following the evaluation of the evidence and (2) there is no compelling reason why the Commission should have adopted the Attorney General's five-year proposal or IIEC/CUB's seven-year proposal.  We agree with Ameren and the Commission.

- 24 -

¶ 67        The Commission in its final order noted it addressed this amortization issue less than one year prior in *In re Commonwealth Edison Co.*, Ill. Comm. Comm'n No. 18-0808 (Order-Final Dec 4, 2018).  Here, as in the *Commonwealth Edison* order, the Commission finds that an amortization period for unprotected property-related EDIT that is calculated using the ARAM or a 35-year proxy aligns the amortization of EDIT with the useful life of the assets.  The Commission found the Attorney General and IIEC/CUB failed to demonstrate a different outcome was warranted.  Specifically, the Commission stated,

> "Neither the [Attorney General] nor IIEC/CUB provide a clear methodology to support a specified period, or clear explanation how a short period will benefit the customers overall, as compared to the 35-year period derived from the commonly accepted ARAM method.  The [Attorney General] and IIEC/CUB argument that a shorter amortization period will ensure the same customers that funded the EDIT balanced will enjoy the return is not supported by the evidence."

¶ 68        The Commission also rejected the Attorney General's contention that ADIT and EDIT are ratepayer funded, thereby justifying an accelerated amortization period.  The Commission noted it also previously rejected this contention in *Commonwealth Edison*.  Specifically, the Commission stated,

> "As [Ameren] explains, [Ameren's] income tax expense is reflected in its revenue requirement at statutory tax rates.  If taxes are deferred, ratepayers enjoy the benefit of an offset to rate base for the jurisdictional ADIT amounts and a reduced effective tax

rate. Thus, the deferral of taxes reduces the amount customers would otherwise pay, and customers are not paying the full dollar for dollar impact of deferred tax expense. Even when the deferred tax amounts become excess with the reduction in federal income tax rates, ratepayers have not supplied the full EDIT amount."

¶ 69 The Attorney General argues the Commission erred when it found ADIT and EDIT are not ratepayer funded. The Attorney General asserts EDIT is always ratepayer funded because, by definition, it consists of money that was collected from ratepayers to pay deferred taxes that become excess due to later changes in the tax rate. If Ameren had not collected EDIT from its customers, there would be no money to refund and no reason to remit it to them or deduct it from rate base. Therefore, the EDIT being returned to the ratepayers must have been supplied by ratepayers because that is a defining characteristic of EDIT. The Attorney General argues a shorter amortization period is proper to refund unprotected property-related EDIT to the customers who funded the EDIT.

¶ 70 In support of its argument, the Attorney General cites *Business and Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 258, 585 N.E.2d 1032, 1068 (1991). In *Business and Professional People for the Public Interest*, our supreme court affirmed the Commission's decision to amortize unprotected property-related EDIT over a three-year period because it was "fair and reasonable to return these excess ADITs to the ratepayers who actually paid this money to the company." *Business and Professional People for the Public Interest*, 146 Ill. 2d at 258. We find the case law distinguishable.

¶ 71 While the court in *Business and Professional People for the Public Interest* affirmed the Commission's decision to adopt a shorter amortization period to refund the

"ratepayers who actually paid this money to the company[,]" the court in *Central Illinois Public Service Co v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 439, 610 N.E.2d 1356, 1368 (1993), found *Business and Professional People for the Public Interest* "does not mandate a particular treatment of excess unprotected deferred taxes in all cases." Rather, in *Central Illinois Public Service*, the Commission found its decision in *Business and Professional People for the Public Interest* to impose a shorter amortization period had "resulted from the particular facts of that case." *Id.* at 439. In *Central Illinois Public Service*, the Commission adopted a longer amortization period to return unprotected property-related EDIT, over the much longer remaining useful life of the assets. *Id.* at 437-40.

¶ 72        Ameren argues ADIT and its related EDIT are not ratepayer funded. Rather, ADIT is more accurately characterized as an interest-free loan from the government. Specifically, Ameren explains as an interest-free source of capital, ADIT is deducted from rate base so that customers do not provide a return on the ADIT amounts. This reduces the revenue requirement and thus the amount customers pay. In other words, when taxes are deferred, customers pay less than they would if no taxes were deferred. Therefore, customers cannot say they have "supplied" the full deferred tax amounts recorded as ADIT. Even when the deferred tax amounts become excess with the reduction in federal income tax rates, customers have not paid the full EDIT amount.

¶ 73        The Commission agreed with Ameren that ADIT and its related EDIT are not ratepayer funded. The Commission found the EDIT at issue in this case became excess ADIT as a result of the federal tax rate change. Thus, contrary to the Attorney General's assertion, Ameren can flow EDIT through to customers not because they prepaid it, but because Ameren no longer owes that money to the government. Based on the evidence, we agree with the

- 27 -

Commission and find the Attorney General failed to provide substantial evidence that ADIT and its related EDIT are ratepayer funded.

¶ 74 Even assuming, *arguendo*, EDIT is ratepayer funded, that issue is irrelevant to the question of whether the Commission adopted the appropriate amortization period for unprotected property-related EDIT. The source of EDIT would not mandate a specific amortization period. Rather, the selection of an appropriate amortization period is a decision that falls within the Commission's broad discretion. "The Commission has broad discretion in deciding what is reasonable and it is not the position of this court to interfere with the functions and authority of the Commission, so long as [its] order demonstrates a sound and lawful analysis of the problems encountered." *Camelot Utilities, Inc. v. Illinois Commerce Comm'n*, 51 Ill. App. 3d 5, 9-10, 365 N.E.2d 312, 315 (1977).

¶ 75 The Commission adopted Ameren's proposal to amortize unprotected property-related EDIT over 35 years. Consistent with that finding, the Commission approved Ameren's proposal to use "the ARAM methodology for all property-related excess deferred taxes, both protected and unprotected, or a 35-year proxy where ARAM is not feasible." Ameren argued using ARAM amortization or its 35-year proxy would (1) cost ratepayers less over the long term; (2) avoid a substantial spike in the revenue requirement in the year after the Attorney General's proposed five-year amortization period; and (3) allocate EDIT to all customers that will pay for and support the depreciable asset smoothly over its useful life. Stafford explained that ARAM amortization provides for "intergenerational integrity" by allocating the EDIT to all of the customers that will pay for and support the depreciable asset smoothy over its useful life.

- 28 -

¶ 76        The Attorney General argues the Commission erred when it adopted a 35-year amortization period.  Specifically, the Attorney General asserts the Commission failed to consider the interests of the ratepayers who supplied the EDIT when it adopted its amortization period.  The Attorney General's suggestion of a shorter amortization period appears to rely solely on the proposition that customers should be refunded faster because they funded the EDIT.  As stated above, the Commission rejected that EDIT is ratepayer funded.

¶ 77        Further, the Commission found,

> "[T]he [Attorney General] and IIEC/CUB have not demonstrated that a different outcome is warranted here.  While the Commission agrees with the [Attorney General] that EDIT balances should be returned to the customers and returned in a manner that benefits the customers, the Commission is not persuaded that the [Attorney General] proposed five-year amortization period, or the IIEC/CUB proposed seven-year period will provide such benefit.  Neither the [Attorney General] nor IIEC/CUB provide a clear methodology to support a specified period, or clear explanation to how a shorter period will benefit the customers overall, as compared to the 35-year period derived from the commonly accepted ARAM method.  The [Attorney General] and IIEC/CUB argument that a shorter amortization period will ensure that the same customers that funded the EDIT balances will enjoy the return is not supported by the evidence."

The Commission also found the Attorney General overlooked the interests of customers in the long term, the customers that will continue paying for the underlying assets. Where the Commission was tasked with balancing the interest of all customers, in the long-term and short-term, it found a 35-year amortization period was more equitable and benefited all customers. As stated above, each case is dependent on the relevant facts of the case and it is up to the Commission to determine the appropriate amortization period. See *Central Illinois Public Service*, 243 Ill. App. 3d at 439.

¶ 78 The Commission's order adopting a 35-year amortization period based on the ARAM method for unprotected property-related EDIT was reasonable and supported by witness testimony. The decision also coincided with the recommendations of the Staff and was consistent with the Commission's prior approach regarding this issue in *Commonwealth Edison*. Based on the evidence, we find the Attorney General failed to meet its burden of establishing the Commission's order was not supported by substantial evidence. Where the Commission's order demonstrates a sound and lawful analysis of the problems encountered, the court will not interfere with the function and authority of the Commission. See *Camelot Utilities*, 51 Ill. App. 3d at 9-10.

¶ 79 D. CWIP-Related ADIT

¶ 80 Last, the Attorney General argues the Commission erred when it excluded from rate base CWIP-related ADIT. The Attorney General proposed the Commission include CWIP-related ADIT in rate base regardless of whether the underlying CWIP costs were included in rate base. Ameren and the Commission argue the Commission properly excluded from rate base CWIP-related ADIT where the corresponding CWIP was not included in rate base because the project was not yet placed in service. Ameren based its argument on prior Commission

practice and consistent ratemaking treatment of ADIT and its related cost items. We agree with Ameren and the Commission.

¶ 81 The Commission in its final order adopted Ameren's proposal to exclude from rate base CWIP-related ADIT where the corresponding CWIP was not included in rate base because the project was not yet placed into service. The Commission based its findings, in part, on prior Commission practice. Specifically, the Commission found,

> "In Docket No. 14-0317, [Ameren] accepted Staff and the
> [Attorney General]'s proposals to remove ADIT assets and
> liabilities from rate base when the underlying cost item was not
> also in rate base, in order to ensure consistency between the
> ratemaking treatment of ADIT and its related cost items. In that
> case, the Commission approved the adjustment, finding the parties'
> treatment of the identified ADIT issues appropriate. The
> Commission finds that the same logic applies in this case, and the
> [Attorney General] has not demonstrated why the Commission
> should treat the CWIP-related ADIT in this case differently. It is
> undisputed that [Ameren] does not earn a cash return on its CWIP
> project costs until those projects are placed into service and
> included in rate base. At that time, ratepayers will begin to pay for
> those projects. And at that time, [Ameren] also includes the ADIT
> related to those CWIP investments as a liability that offsets rate
> base. The accrual of AFUDC until that point is immaterial because

AFUDC does not provide a current cash return, a fact that the

[Attorney General] does not contest."

¶ 82        The Attorney General argues the Commission failed to address the problem

caused by calculating a part of AFUDC based on CWIP-related ADIT, instead stating that the

accrual of AFUDC "was immaterial because AFUDC does not provide a current cash return."

The Attorney General alleges the fact that AFUDC does not provide a current cash return does

not change the fact that AFUDC provides a future cash return, which it argues is partially

derived from CWIP-related ADIT, when it is included in rate base.  The Attorney General argues

by deciding this issue based solely on its practice of matching ADIT with its associated asset, the

Commission failed to address the problem caused by AFUDC and impermissibility allowed

Ameren to earn a deferred return on CWIP-related ADIT.  We disagree.  The Commission never

alleged Ameren does not accrue AFUDC, rather the Commission stated the accrual of AFUDC is

"immaterial" before the CWIP costs are included in rate base.  When CWIP costs are included in

rate base, Ameren also includes CWIP-related ADIT to those CWIP investments as a liability to

offset rate base.

¶ 83        The Attorney General's proposal to include CWIP-related ADIT in rate base

regardless of whether the underlying CWIP costs were included in rate base sought to lower

current customers rates, leaving the cost of the CWIP assets for future ratepayers to bear.  The

Commission rejected the Attorney General's proposal to include CWIP-related ADIT into rate

base regardless of whether the underlying CWIP costs were included, determining the Attorney

General's approach was "inconsistent with prior Commission practice and would result in an

inequitable treatment of ADIT and its related costs items."  Further, the Commission found the

Attorney General's reliance on a Missouri Commission decision "unpersuasive, particularly where this Commission has examined this issue more recently and come to the opposite result."

¶ 84　　　　　The Commission's order excluding from rate base CWIP-related ADIT where the corresponding CWIP was not included in rate base because the project was not yet placed in service was reasonable and supported by the evidence. The decision also coincided with prior Commission practice and consistent ratemaking treatment of ADIT and its related cost items. Based on the evidence, we find the Attorney General failed to meet its burden of establishing the Commission's order was not supported by substantial evidence. As stated above, where the Commission's order demonstrates a sound and lawful analysis of the problems encountered, the court will not interfere with the function and authority of the Commission. See *Camelot Utilities*, 51 Ill. App. 3d at 9-10.

¶ 85　　　　　　　　　　　　　III. CONCLUSION

¶ 86　　　　　For the reasons stated, we affirm the Commission's order.

¶ 87　　　　　Affirmed.