2022 IL App (2d) 210415-U
No. 2-21-0415 & 2-21-0420 cons.
Order filed May 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ILLINOIS COMPETITIVE ENERGY ASSOCIATION; RETAIL ENERGY SUPPLY ASSOCIATION; CARGILL, INC.; CATERPILLAR, INC.; STERLING STEEL COMPANY; INGREDION INCORPORATED; and EXXONMOBIL POWER & GAS SERVICES, INC., | ) ) ) ) ) ) ) ) | On Petition for Administrative Review from The Illinois Commerce Commission |
| Petitioners, | ) ) | |
| v. | ) ) | ICC Docket No. 20-0606 |
| THE ILLINOIS COMMERCE COMMISSION; NORTHERN ILLINOIS GAS COMPANY d/b/a Nicor Gas Company; CONSTELLATION NEW ENERGY–Gas DIVISION, LLC; GRAIN AND FEED ASSOCIATION OF ILLINOIS; ILLINOIS MANUFACTURER'S ASSOCIATION; ILLINOIS ASPHALT PAVEMENT ASSOCIATION; NUCOR STEEL KANKAKEE, INC.; SEQUENT ENERGY MANAGEMENT, LP; and ILLINOIS ENERGY, USA, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The Appellate Court affirmed the decision of the Illinois Commerce Commission where (1) Nicor presented evidence of the impact of its proposed tariff changes on customers and (2) the Commission's order was sufficient to allow review and was supported by substantial evidence.

¶ 2    In this appeal, which was consolidated for purposes of oral argument and disposition,[1] petitioners, Illinois Competitive Energy Association (ICEA), Retail Energy Supply Association (RESA), Cargill, Inc., Caterpillar, Inc., Sterling Steel Company, Ingredion Incorporated, and ExxonMobil Power & Gas Services, Inc. (collectively Illinois Industrial Energy Consumers) (IIEC), appeal an order of the Illinois Commerce Commission (Commission) approving changes to respondent's, Northern Illinois Gas Company, d/b/a Nicor Gas Company's (Nicor) tariffs. These changes relate to Nicor's natural gas storage parameters and "cash-out" provisions stemming from Nicor's ownership and operation of eight underground aquifer storage reservoirs of natural gas. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Nicor is a public utility engaged in the distribution of natural gas at retail. Nicor serves two types of customers. "Transportation" customers purchase natural gas from suppliers other than Nicor but use Nicor's transmission and distribution systems, including Nicor's aquifer storage reservoirs. "Sales" customers purchase natural gas directly from Nicor. For both types of customers, Nicor delivers the purchased gas to the end consumer.

¶ 5    An aquifer storage reservoir is a naturally occurring underground geologic formation consisting of a water-filled sandstone layer covered by a non-permeable dome-shaped caprock. Natural gas injected into the reservoir displaces the water. This displacement creates the pressure

---

[1] Petitioners withdrew their request for oral argument.

necessary for withdrawal of the gas when appropriate. If an appropriate volume of gas is not withdrawn within prescribed time periods, the pressure in the reservoir moves toward equilibrium, making the gas more difficult to withdraw. Hindering appropriate withdrawal results in a loss of Nicor's working gas inventory and affects all customers.

¶ 6    Nicor plans its injection-withdrawal schedule to maintain the long-term viability of the reservoirs. This process is called "cycling." At the start of the winter season, Nicor fills the reservoirs and then withdraws gas during the heating season, so that the reservoirs are nearly empty of gas at the end of the heating season. Proper cycling is necessary to prevent pressure from moving toward equilibrium and negatively affecting Nicor's future deliveries of gas to all customers.

¶ 7    In 2017, the Commission directed Nicor to evaluate the operational risks of how transportation customers use the reservoirs. Nicor concluded that transportation customers' use, although consistent with current tariffs, nonetheless poses risks to Nicor's future ability to protect its reservoirs and meet the needs of all customers. Specifically, Nicor noted that transportation customers' use deviated from Nicor's planned injection and withdrawal schedules, impacting the long-term integrity of the reservoirs. Based on Nicor's "storage study," the Commission ordered Nicor to propose tariff changes to remedy the problems identified in the study.

¶ 8    On June 30, 2020, Nicor filed proposed revised tariffs related to transportation customers. Nicor proposed that all transportation customers keep their daily and monthly gas inventory balances within certain prescribed parameters. Nicor further proposed that variances from those parameters result in "cash-outs," that is, Nicor would either purchase a transportation customer's excess supply of natural gas or sell a transportation customer a volume of natural gas equal to that

customer's shortfall.[2] Nicor's stated purpose in recommending these tariff changes was for transportation customers to manage their use of the reservoirs within the parameters rather than incur cash-outs. The Commission opened a proceeding at which both Nicor and petitioners, as intervenors (along with other intervenors), participated. The administrative law judge (ALJ) held an evidentiary hearing. Below, we recount only the testimony necessary to understand the issues raised on appeal. We will include additional facts, as necessary, in our analysis.

¶ 9                                    A. Nicor's Evidence

¶ 10    Timothy Sherwood, Nicor's vice-president of gas supply operations, testified that the tariffs must be modified to (1) maintain the integrity of the reservoirs and (2) allow Nicor to operate the reservoirs at optimal pressures. Sherwood testified that the proposed tariffs were "just and reasonable" and that they "balance the interests of all customers," as "all customers benefit" from Nicor's reservoirs. According to Sherwood, Nicor "must meet its delivery obligations to its customers" using its reservoirs. Otherwise, Nicor would need to purchase natural gas elsewhere, which would be expensive and difficult to obtain because existing interstate pipelines serving Nicor's territory are limited.

¶ 11    Sherwood testified that transportation customers' current use of the reservoirs conflicts with the cycling needed to maintain the reservoirs' integrity. Sherwood explained that there is no correlation between the volume of gas that transportation customers "nominate" daily and the amount that such customers' end-consumers use. According to Sherwood, this disparity is "inconsistent" with the "physical operational requirements of the system." Sherwood testified that,

---

[2] During the proceedings before the Commission, Nicor modified its original proposal and asked the Commission to approve its modified proposal.

historically, transportation customers fail to cycle their stored gas throughout the withdrawal season, making it difficult for Nicor to manage the reservoirs' "operational viability."

¶ 12 Sherwood explained that the proposed tariff changes would require all transportation customers to keep their usage within prescribed daily and monthly parameters, or any variances would be "cashed out" at the end of the month. Sherwood testified that this change would reduce the risk to the system and maintain the reservoirs' continued viability to the "benefit of all customers."

¶ 13 Ann M. Hizon also testified for Nicor. She is Nicor's rates manager. Hizon testified that the purpose of the tariff changes is to "place all customers" who use Nicor's reservoirs "under the same fair and equitable rules," while allowing Nicor to operate the reservoirs "safely" to maintain "peak" and subsequent peak-day delivery of natural gas.

¶ 14 Daniel P. Yardley, a professional consultant to Nicor, testified that Nicor's proposed tariff modifications are needed to maintain the operational integrity of the reservoirs.

¶ 15                                    B. Intervenors' Evidence

¶ 16 John Mehling, senior regional operations manager at Direct Energy, testified on behalf of ICEA and RESA. Mehling opined that Nicor's proposed tariff changes would "take away" much of the transportation customers' operational flexibility, "driving up costs to transportation customers with no corresponding benefit to any customer group." According to Mehling, the proposed changes will result in higher costs to all Nicor customers. Mehling described the proposed changes as "punitive" and not justified by any physical conditions. Mehling testified that Nicor, under the current tariffs, is "managing the system in a way that adequately protects its storage assets." According to Mehling, the reservoirs are "operating well."

¶ 17    According to Mehling, transportation customers serve their consumers using pricing contracts that are specific to each consumer. Transportation customers' consumers' needs "vary widely." Mehling testified that transportation customers need flexibility to inject gas into the reservoirs as they choose. Mehling opined that Nicor's storage study does not support Nicor's belief that transportation customers' current use of the reservoirs negatively impacts the reservoirs. Mehling testified that Nicor admitted in discovery that it is currently managing the system and is not close to maximizing its storage capacity. Mehling concluded that "further restraints on [transportation customers'] behavior" are not necessary. Mehling testified that what Nicor describes as "problematic" behavior on the part of transportation customers is the way the system was designed to work. According to Mehling, Nicor's proposed tariff changes would result in a 30-day "one-size-fits-all paradigm for widely disparate circumstances which restricts customer choice and limits flexibility."

¶ 18    Mehling opined that Nicor's proposed changes would have a "strongly negative impact" on both transportation customers and their consumers. RESA and ICEA members, as well as other transportation customers, will have fewer options and higher costs. According to Mehling, this harm "is not offset by any benefits to any group of customers."

¶ 19    Michael King testified on behalf of RESA and ICEA. King is a geologist and consultant. King opined that Nicor has "effectively managed its natural gas storage operations to meet all of the requirements of its sales and transportation customers' needs for gas storage, and, more importantly, that the physical integrity of its gas storage fields has not been negatively impacted." King concluded that Nicor's existing tariffs adequately protect the reservoirs. King concluded that there is no credible evidence that transportation customers are damaging the reservoirs.

¶ 20    Michael P. Gorman testified on behalf of IIEC. Gorman is a consultant in the field of public utility regulation. Gorman opined that Nicor's proposed tariff changes are not "revenue neutral," especially for transportation customers, and should not be approved. According to Gorman, the penalties on transportation customers who need less than 30-days' worth of gas would be "very severe." Gorman testified that transportation customers needing more than 30-days' worth of gas would also suffer negative consequences.

¶ 21    Gorman testified that Nicor's reservoirs are not at risk of degradation. According to Gorman, transportation customers' practices have not impaired Nicor's ability to "balance its system," nor have those practices negatively impacted sales customers. Gorman testified that the storage study shows that Nicor has managed its reservoirs to protect their long-term viability.

¶ 22    Joshua Bourget, principal analyst for Constellation New Energy–Gas Division, LLC (CNEG), testified that he analyzed how Nicor's proposed tariff changes would impact CNEG. Bourget concluded that the changes would result in cash-outs on many days throughout the year. From CNEG's perspective, the proposed tariff changes are not revenue neutral.

¶ 23    David Vognsen testified on behalf of Grain and Feed Association of Illinois (GFAI). Vognsen is an expert in utility rate regulation. Vognsen testified that Nicor's proposed tariff changes "may not be" the "most prudent and cost effective" for customers because Nicor failed to consider any alternatives to its own "on-system storage." Vognsen testified that Nicor refused to inform GFAI of the cost impact of the tariff changes to GFAI's consumers. Vognsen testified that Nicor's proposed tariffs are not revenue neutral, and he described the impact to GFAI's consumers as "rate shock." Vognsen opined that, to charge all transportation customers "in the same manner," is neither fair nor equitable. According to Vognsen, because not all transportation customers use

Nicor's reservoirs the same way, individual transportation customers should be charged only for their own use.

¶ 24　Louie R. Ervin II also testified on behalf of GFAI. Ervin is an energy advisor to Midwestern purchasers of natural gas. Ervin opined that Nicor's proposed tariff changes, particularly the cash-outs, unfairly shift costs to seasonal transportation customers, such as GFAI. Ervin testified that Nicor will not pay market price when purchasing a transportation customer's excess supply of gas. According to Ervin, seasonal transportation customers do not need 30-days' worth of storage all year. Nicor's proposed tariffs could result in two of GFAI's consumers paying an increase of 294% and 572%, respectively. According to Ervin, other seasonal industries would be similarly impacted. Ervin opined that GFAI does not contribute to Nicor's problems during peak cold winter months, because GFAI's use occurs during the harvest season.

¶ 25　　　　　　　　　　　　C. Commission Staff's Evidence

¶ 26　Dr. David Rearden is a senior economist on the Commission's staff. Dr. Rearden testified that some of Nicor's proposed changes are reasonable and necessary; however, Dr. Rearden recommended giving transportation customers more flexibility than Nicor's other proposed tariff changes would afford.

¶ 27　Dr. Rearden testified that some transportation customers use the reservoirs differently from how Nicor uses them. For instance, some transportation customers are allowed to inject gas in the winter and withdraw it in the summer. Those transportation customers are not required to completely empty their allocation in the winter, nor are they required to fill it completely in the summer. According to Dr. Rearden, this practice requires Nicor to make up the difference so as not to degrade the reservoirs. Dr. Rearden testified that Nicor proposed to significantly narrow transportation customers' ability to vary their storage usage. Dr. Rearden opined that Nicor's

proposed tariff changes are not revenue neutral as to transportation customers. Dr. Rearden also opined that Nicor has adequately managed its reservoirs and it is "unclear" whether maintaining the current practice would compromise the reservoirs.

¶ 28                                    D. Nicor's Rebuttal Evidence

¶ 29    Sherwood testified that transportation customers are "unwilling" to change the *status quo*, which places the burden of achieving the required cycling with sales customers. According to Sherwood, such a position is "self-interested" and "myopic." According to Sherwood, Nicor's reservoirs are "valuable, not only to transportation customers but to all [Nicor] customers." Sherwood testified that, on "numerous occasions," Nicor has taken measures to offset actions of transportation customers that threaten the reservoirs. According to Sherwood, maintaining the *status quo* is not justified. Sherwood opined that proactive action is required now to preserve the reservoirs "going forward." According to Sherwood, maintaining the *status quo* will result in "uneconomic" decisions for sales customers.

¶ 30    Sherwood testified that, if transportation customers alter their use to conform to the new tariffs, they will not incur cash-outs and will avoid costly penalties. Thus, Sherwood concluded that transportation customers' claims about increased costs are unfounded. However, if transportation customers do not stay within the proposed parameters and incur cash-outs, sales customers will benefit through a gas-adjustment rider.

¶ 31    Sherwood testified that there has always been "variability" in transportation customers' use of storage, but now that variability is "much larger," making it difficult to manage cycling to meet the needs of all of Nicor's customers. Sherwood testified that Nicor is "running out of tools" to "balance the system." Sherwood opined that, if Nicor waits until "something bad occurs," it may be too late to avoid long-term damage to the reservoirs.

¶ 32    Sherwood testified that Nicor's planning is "significantly complicated" by transportation customers' unpredictability. According to Sherwood, any transportation customer that uses storage "outside the physical storage limits" causes Nicor difficulty in managing the reservoirs. Sherwood testified that those issues are present even when transportation customers operate within the current tariffs. Sherwood testified that all customers benefit from the reservoirs because the reservoirs are critical to Nicor's ability to provide reliable service to all customers. According to Sherwood, there are real economic benefits to customers in maintaining the current operational capacity of the reservoirs. Otherwise, Nicor would need to obtain gas elsewhere at great cost.

¶ 33    Sherwood testified that Nicor offsets the actions of some transportation customers that inject gas in the winter and withdraw it in the summer. According to Sherwood, it is Nicor's offsets that prevent degradation of the reservoirs. Sherwood disagreed that the reservoirs themselves can accommodate improper cycling.

¶ 34    Yardley testified that claims that Nicor's proposed tariffs are not revenue neutral are based on an unrelated concept of a rate impact to a particular customer. According to Yardley, Nicor will not profit from the tariff changes. Yardley testified that transportation customers' objections assume "little or no change in behavior" in response to Nicor's revised parameters for using the reservoirs. According to Yardley, Nicor's overarching goal in proposing the tariff changes is not to increase costs to individual transportation customers but to modify their behavior toward the reservoirs. Yardley opined that the transportation customers and Commission staff did not submit workable solutions. Yardley opined that maintaining the *status quo* negatively impacts sales customers, the majority of which are residential.

¶ 35                    E. Intervenors' Rebuttal Evidence

¶ 36    King testified that the "marginal increase" in storage volumes caused by transportation customers' summer injections is insufficient to adversely affect the reservoirs. King testified that transportation customers' inventories have "relatively limited fluctuations." King opined that the reservoirs had not been compromised for more than the past 10 years and would not be compromised in the future by retaining the current tariffs.

¶ 37    Mehling opined that Nicor already has the "tools" to deal with future adverse situations. Mehling testified that Nicor tried to justify the tariff changes by alleging "unquantified" and "hypothetical" future harms to sales customers. According to Mehling, Nicor failed to present "factual justification" to support its witnesses' testimony. Mehling testified that there is no evidence that transportation customers are forcing Nicor to make uneconomic decisions for sales customers. Mehling termed Sherwood's testimony in this regard "speculating." Mehling testified that Sherwood's assumption that transportation customers make no efforts to balance the system is false.

¶ 38    Gorman testified that Nicor's proposed tariff changes will not equalize treatment of sales and transportation customers but will create "far more" restrictions and penalties on transportation customers. According to Gorman, Nicor offered no evidence that the *status quo* negatively affects sales customers. Gorman testified that transportation customers respond to their suppliers' activity. Thus, says Gorman, Nicor should seek to modify the behavior of these suppliers instead of transportation customers. Gorman opined that imposing "onerous penalties" on transportation customers, and reducing their flexibility, may not cure Nicor's problems.

¶ 39    Bourget termed Nicor's proposed tariff changes "extreme overreach." Bourget also termed the proposed changes a "chainsaw" approach. Bourget predicted that, even with modifying behavior, transportation customers would incur heavy cash-out costs. Bourget testified that

Sherwood's testimony to the contrary is not supported by analytical evidence. According to Bourget, Nicor opted not to conduct its own cost analysis and is hiding "very real cost increases" behind the banner of revenue neutrality.

¶ 40    Vognsen testified that Nicor did not consider that seasonal transportation customers are not causing the issue that Nicor's proposed tariff changes seek to remedy. Vognsen testified that GFAI's consumers cannot modify their behavior going forward because they are "totally dependent" on the timing of the harvest for their use of gas in grain-drying operations. Cost increases of over 500%, according to Vognsen, would be "devastating" for these consumers. Vognsen opined that a revenue-neutral tariff should be based on the costs to provide the service.

¶ 41    Ervin testified that Nicor did not solicit any customer "input" but designed its storage portfolio unilaterally. According to Ervin, Nicor is silent respecting whether it conducted a cost analysis of alternatives to aquifer storage, such as pipeline storage. Ervin opined that Nicor's modifications to its original proposal only make more cash-out problems because grain dryers cannot alter their behavior but "must" dry grain when it comes out of the field.

¶ 42    Kevin Burke III testified on behalf of the Illinois Asphalt Pavement Association (IAPA). Burke is vice-president of IAPA. Burke testified that IAPA's consumers cannot modify their behavior because their gas needs are dictated by seasonal forces outside their control.

¶ 43                          F. Nicor's Surrebuttal Evidence

¶ 44    Sherwood presented Nicor's modified proposal to daily and monthly storage parameters and cash-out structures, adopting certain of the Commission's staff's recommendations.[3]

---

[3] The specifics of the revised proposed tariffs are not germane to this appeal.

According to Sherwood, the revised proposal offers transportation customers flexibility and addresses their cash-out concerns.

¶ 45 G. The Commission's Order

¶ 46 On May 13, 2021, the Commission filed its 48-page single-spaced typed order. The Commission approved Nicor's tariff changes, as modified from its original proposal. The Commission found, *inter alia*, that Nicor's reservoirs would degrade if changes were not made to foster proper cycling. Petitioners filed timely petitions for review, which, as noted, were consolidated for purposes of oral argument and disposition.

¶ 47 II. ANALYSIS

¶ 48 Petitioners raise three issues: (1) Nicor presented no evidence concerning the impact of its proposed tariff changes on sales and transportation customers, (2) the Commission's order does not contain findings or analysis sufficient to allow informed judicial review, and (3) the Commission's order is not supported by substantial evidence.

¶ 49 A. Standards of Review

¶ 50 Section 9-201(c) of the Public Utilities Act (Act) (220 ILCS 5/9-201(c) (West 2018)) authorizes the Commission to approve tariffs which it finds are "just and reasonable." The utility has the burden of proof at a hearing before the Commission. 220 ILCS 5/9-201(c) (West 2018).

¶ 51 We are required to give substantial deference to the Commission's decisions, given its expertise and experience. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). The findings and conclusions of the Commission on questions of fact shall be held to be *prima facie* reasonable, and the burden of proof on all issues raised by an appeal is on the party appealing from the Commission's decision. 220 ILCS 5/10(d) (West 2018). Thus, the party challenging the finding of fact has the burden of showing that it is against the manifest weight

of the evidence. *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 41. A finding of fact is against the manifest weight of the evidence only if that finding is arbitrary, unreasonable, or not based on the record or the opposite conclusion is clearly evident. *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 41. If the court determines that the Commission's order or decision does not contain findings or analysis sufficient to allow informed judicial review, the court shall remand with instructions to make such necessary findings or analysis. 220 ILCS 5/10(d) (West 2018). The court shall reverse the Commission's decision where, *inter alia*, the Commission's findings are not supported by substantial evidence based upon the entire record. 220 ILCS 5/10(d) (West 2018).

¶ 52      This court's review is limited to whether (1) the Commission acted within its authority, (2) the Commission made adequate findings to support its decision, (3) the decision was supported by substantial evidence, and (4) state or federal constitutional rights were infringed. *Commonwealth Edison*, 398 Ill. App. 3d at 514. On review, we cannot reevaluate witnesses' credibility or the weight of the evidence, nor can we substitute our judgment for that of the Commission. *Commonwealth Edison*, 398 Ill. App. 3d at 514.

¶ 53                          B. Evidence Concerning Impact on Customers

¶ 54      Petitioners argue that the Commission failed to consider the impact of Nicor's restructuring on customers because Nicor presented no such evidence. Petitioners rely on *Citizens Utility Board v. Illinois Commerce Comm'n (CUB I)*, 276 Ill. App. 3d 730, 737 (1995), where the court held that the Commission cannot fulfill its statutory duty to balance the competing interests of stockholders and ratepayers without considering the impact of proposed rates on ratepayers. The court further held that the Commission's finding that restructured rates were just and reasonable was not

supported by sufficient evidence where the utility presented no evidence concerning the impact of rate restructuring on consumers. *CUB I*, 276 Ill. App. 3d at 738-39.

¶ 55 Here, petitioners assert that Nicor did not present a "rate impact analysis" that considered the effect of restructuring on transportation customers. Petitioners maintain that Nicor's "sole evidence" is the unsupported conclusion that, if transportation customers stay within the proposed parameters, they will not incur cash-out costs, which was refuted by the intervenors' evidence. Petitioners also argue that the Commission's order makes no reference to the impact of restructuring on customers.

¶ 56 The Commission's order contains a section labeled "Tariff Impacts on Transportation Customers" and another section labeled "Tariff Impacts on Sales Customers." These sections set forth in detail, over nearly six single-spaced pages, the positions presented by both sides on these topics. The Commission found that Nicor's proposed changes are just and reasonable and "benefit all customers." The Commission found that all customers benefit from protecting the reservoirs, Nicor's proposed modifications treat all customers equally, and maintaining the *status quo* negatively impacts sales customers, who are mostly residential. Consequently, petitioners' argument that the Commission's order makes no reference to customer impact is not well taken.

¶ 57 Similarly, petitioners' argument that Nicor presented no evidence of customer impact is not supported by the record. Sherwood testified that all customers benefit from the reservoirs. Indeed, this seems self-evident, even without any scientific study. If Nicor did not store natural gas, and maintain the integrity of the storage, all customers would be at risk. Nicor would either not have any gas to meet customers' needs or would have to obtain it elsewhere. The evidence showed that obtaining it elsewhere would be costly because of lacking infrastructure. Sherwood also testified that transportation customers' current use of the reservoirs negatively impacts sales

customers, who are mostly residential, because that use jeopardizes the long-term viability of the reservoirs. As to the benefit to transportation customers, Nicor presented testimony that they will not incur cash-outs if they modify their behavior going forward. Nicor also presented evidence that restructuring will treat all transportation customers alike. For this reason, the intervenors argued that Nicor's proposal was "one-size-fits-all."

¶ 58    Petitioners' argument that Nicor presented no evidence of impact really amounts to arguing that we should weigh the evidence differently from the Commission, as petitioners assert that Nicor's evidence was merely "conclusory." We are not to reweigh evidence or make an independent determination of the facts. *People ex rel. Raoul v. Illinois Commerce Comm'n*, 2021 IL App (1st) 200366, ¶ 70. Consequently, we reject this argument.

¶ 59              C.   The Commission's Order is Sufficient to Allow Review

¶ 60    Petitioners argue that the Commission did not make sufficient findings to meet the Act's requirements for final orders. Petitioners assert that the order summarizes the parties' positions rather than analyzing the various arguments.

¶ 61    Section 5/10-201(e)(iii) of the Act (220 ILCS 5/10-201(e)(iii) (West 2018)) requires the Commission to provide "findings or analysis sufficient to allow an informed judicial review." *Citizens Utility Board v. Illinois Commerce Comm'n (CUB II)*, 291 Ill. App. 3d 300, 304 (1997). Because of this provision, the Commission must set forth more reasoning and analysis than would be acceptable from a circuit court. *CUB II*, 291 Ill. App. 3d at 304. However, the Commission is not required to make particular findings as to each evidentiary fact or claim. *CUB II*, 291 Ill. App. 3d at 304. Nor is the Commission required to disclose its mental operations. *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 716 (1997). The Commission need only

set forth the facts that form the basis for its order so that informed review is not hindered. *Abbott Laboratories*, 289 Ill. App. 3d at 716.

¶ 62     Petitioners contend that the order fails to address the substantive arguments that they and others raised before the Commission, but instead notes only the number of parties that opposed Nicor's restructuring. Petitioners argue that the Commission's failure to consider the evidence is demonstrated by the fact that it miscounted the parties opposing Nicor's storage parameters and completely ignored King's testimony.

¶ 63     The order sets forth in detail what the contested issues before the Commission were and each party's position regarding those issues. Petitioners object that merely summarizing arguments is not analysis, and that, even if it is considered analysis, the summaries here are not "diligent" analysis. The Commission's order follows the presentation of the parties' positions with four and a half single-spaced pages of the Commission's own "analysis and conclusion," in which it makes findings and substantively discusses why it agrees or disagrees with the parties. Petitioners' argument that the Commission ignored the evidence because it misstated the number of parties opposing Nicor's changes and did not discuss King's testimony is nothing more than asking us to reweigh the evidence.

¶ 64     Petitioners selectively quote from the order. For instance, they argue that the Commission's "sum total" discussion of storage parameters is the following sentence: "As to the storage parameters themselves, this issue appears to be uncontested by all parties except for ICEA/RESA." However, this sentence is one in 17 paragraphs discussing why the Commission authorized Nicor to file new tariffs. Viewed in context, the sentence that petitioners quote is part of a discussion of why Nicor's usage parameters must be tightened.

¶ 65    Another example of petitioners' selective quoting is their argument that the following sentence does not offer any analysis because it does not compare Mehling's contrary opinion: "Dr. Rearden's modifications more appropriately respond to differences between actual storage usage and tariff requirements." In context, this sentence relates to the Commission's earlier observation that ICEA/RESA rely on Nicor's admission that it has never failed to withdraw a sufficient volume of gas by the end of each injection period. The quoted sentence shows why the Commission rejects the *status quo*. Additionally, petitioners complain that the order does not acknowledge or analyze Mehling's proposals. Mehling's entire testimony, however, was an argument for the *status quo*, which the Commission considered and rejected. Petitioners also argue that the Commission ignored a hydrology expert's opinion that Nicor has effectively managed its operations to meet all of its customers' requirements without negatively impacting the reservoirs, but this, again, is evidence in support of the *status quo*, which the Commission rejected. Sherwood testified that the *status quo* cannot be maintained, because, when something "bad" happens, it will be too late.

¶ 66    Petitioners rely on *CUB II*, 291 Ill. App. 3d at 306, where the court held that the Commission's order was lacking in sufficient analysis. In *CUB II*, the Commission's order concluded that drawing a distinction between Commonwealth Edison's marginal customer costs and marginal transmission and distribution costs imposed by existing customers, as opposed to new customers, could produce "distortions" in other areas of the marginal cost studies. *CUB II*, 291 Ill. App. 3d at 305. The court noted that this "succinct" statement left the court wondering why such a distinction could create a distortion, what types of distortions could occur, and in what areas these distortions could occur. *CUB II*, 291 Ill. App. 3d at 306. Here, petitioners argue that the Commission's order does not provide us with "any basis" to conduct an informed review but

requires us to "fish" through the record and "guess" what the Commission "may have been thinking."

¶ 67    We disagree. The Commission found that Nicor provided "substantial" evidence to show that the storage rules for transportation customers have remained unchanged for years, despite changing market conditions, and that those customers' use imposes risks to the reservoirs. The Commission also found that the evidence demonstrated that, if there are no adjustments to the current transportation customers' tariffs, the reservoirs will degrade. The Commission further found that, "simply because, thus far, [Nicor] has been able to adequately cycle its aquifer fields does not refute the concerns Mr. Sherwood describes and the risk to [Nicor's] storage system." For these reasons, the Commission adopted Nicor's cash-out procedures, with the modifications suggested by Dr. Rearden. These findings do not leave us guessing what the Commission was thinking. The Commission straightforwardly accepted the testimony that the reservoirs are at risk due to transportation customers' flexible cycling and rejected the intervenors' testimony suggesting that maintaining the *status quo* will not damage the reservoirs.

¶ 68          D.  The Commission's Order is Supported by Substantial Evidence

¶ 69    Lastly, petitioners argue that the record does not contain "more than a scintilla" of evidence that Nicor's proposed changes are just and reasonable. Petitioners contend that Nicor did not quantify the costs of the *status quo* or the proposed restructuring of rates. Petitioners maintain that, at most, Nicor speculated that it would incur future harm, without presenting evidence that the reservoirs are degrading or that the proposed tariffs would prevent degradation. Additionally, petitioners argue that the evidence showed that only a few transportation customers' suppliers are causing a problem, and that the "broad approach" adopted by the Commission is not warranted.

¶ 70    In *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 398 (2010), we said that "substantial" evidence means "more than a scintilla; however, it does not have to rise to the level of a preponderance of the evidence." "Substantial evidence" is that which a " 'reasoning mind would accept as sufficient to support a particular conclusion.' " *Commonwealth Edison*, 405 Ill. App. 3d at 398 (quoting *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009)).

¶ 71    As noted, Nicor presented evidence that transportation customers' flexible cycling would result in long-term degradation of the reservoirs because such use would move the reservoirs toward equilibrium. The evidence showed that loss of the reservoirs would require Nicor to obtain gas elsewhere at great cost. The evidence demonstrated that those costs would impact both types of customers. Nicor also presented evidence that tightening parameters and instituting cash-outs would prevent long-term harm by modifying transportation customers' use of the reservoirs.

¶ 72    Petitioners argue that Nicor's prediction of harm is speculative because no harm has yet occurred. When experts fail to consider their party's actions, base their opinions on facts not in evidence, ignore significant factors, and base their opinions on what might have happened, their opinions are speculative. *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 909 (1995). Here, Sherwood considered how Nicor and transportation customers use the reservoirs and the capacity of the reservoirs to withstand that use. Sherwood testified that no harm had yet occurred because Nicor offset the actions taken by transportation customers. Sherwood testified that Nicor was running out of tools to offset those actions. Thus, Sherwood's testimony was fact-based and not speculative.

¶ 73    As to petitioners' argument that only a few suppliers were creating the problem, the Commission noted that "all parties" appear to "concede that the problems are caused by a small

group of suppliers." To remedy this problem, the Commission approved the tariff changes as modified by the Commission staff in Staff Cross Exhibit 1 and accepted by Nicor.

¶ 74    Petitioners argue that there is no evidence to support the cash-out values that the Commission staff proposed and Nicor accepted. Staff Cross Exhibit 1 is a stipulation between Nicor and the Commission staff reflecting those values. In its order, the Commission adopted the cash-out procedures and nominations changes contained in Staff Cross Exhibit 1. Petitioners assert that the "informal" stipulation as to the values is not evidence, citing *Business & Professional People for Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 216 (1989), where our supreme court held that the Commission did not have authority to accept a settlement agreement that did not have unanimous support. The Commission argues that Staff Cross Exhibit 1 is not a two-way settlement agreement but is a stipulation that was entered into evidence. Petitioners acknowledge that Staff Cross Exhibit 1 was entered into evidence but maintain that the exhibit contains no support for *why* those values should be adopted. However, in its order, the Commission noted that Staff Cross Exhibit 1 reflected Dr. Rearden's modifications, which, the Commission concluded, appropriately addressed making the procedures expensive enough to induce suppliers to change their behavior. The Commission's role is to weigh the evidence and resolve conflicting expert opinions on highly technical matters. *Coalition to Request Equitable Allocation of Costs Together v. Commonwealth Edison Co.*, 2015 IL App (2d) 140202, ¶ 57. Rate-design and cost-allocation issues are uniquely matters within the Commission's discretion. *Coalition*, 2015 IL App (2d) 140202, ¶ 57. Accordingly, we hold that that there is substantial evidence in the record to support the Commission's order.

¶ 75                               III. CONCLUSION

¶ 76    For the reasons stated, we affirm the decision of the Illinois Commerce Commission.

¶ 77    Affirmed.